## NATIONAL LABOR RELATIONS BOARD v. BRASHEAR FREIGHT LINES, Inc.

### No. 477, Original.

Circuit Court of Appeals, Eighth Circuit.
April 17, 1941.

Rehearing Denied May 16, 1941.

Charles M. Brooks, Atty., National Labor Relations Board, of Washington, D. C. (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Allen Heald and David C. Sachs, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Stephen C. Rogers, of St. Louis, Mo., for respondent.

Before STONE and GARDNER, Circuit Judges, and OTIS, District Judge.

STONE, Circuit Judge.

This is a petition for enforcement of an order of the National Labor Relations Board directed to the respondent. The complaint herein was based upon verified charges preferred by the International Association of Machinists, District No. 9 (hereinafter called Union), affiliated with the American Federation of Labor.

The order of the Board required respondent to "cease and desist" from certain things and, also, to take certain "affirmative action". The cease and desist portions of the order were: (1) From discouraging membership in the Union; (2) from interfering with, restraining, or coercing its employees in the exercise of their rights to self-organization for collective bargaining or other mutual aid or protection purposes. The affirmative actions required were: (1) To reinstate without prejudice and to make whole two discharged employees, Lupardus and Walton; (2) "upon application" to reinstate or place upon a preferential list certain striking employees and to make them whole under conditions set forth in the order; (3) to post and maintain notices that respondent "will cease and desist in the manner aforesaid"; (4) to notify the Board of compliance.

The response attacks the sufficiency of the evidence to sustain the findings of the Board which are the bases of the various provisions in its order; denies the power of the Board to issue the complaint; and the power of the Board to cause respondent to post notices that it "will cease and desist in the manner aforesaid".

### Power of Board to Issue Complaint.

Since the power of the Board to issue the complaint strikes at the entire proceeding—in a jurisdictional sense and irrespective of the merits—we consider that contention first. The situation giving rise to this contention is as follows. The charge, upon which the complaint issued, was made by the Union. Therein, were stated interference, restraint and coercion of employees in the exercise of their rights under Section 7 of the Act, 29 U.S.C.A. § 157; discriminatory discharge of named employees because of their Union activities; and refusal to bargain with the representative of a majority of the employees. The complaint set forth the items in the "Charge" with more particularity and detail. As to the refusal to bargain item, the complaint set forth that a majority of the employees in the appropriate bargaining unit had designated the Union as their bargaining representative. The Board found that the Union had not been so designated by a majority of the employees in the unit and, therefore, determined there had been no violation of the Act in refusing to bargain with the Union.

In this situation, respondent contends that when the Board found that the Union, which made the Charge, did not represent such majority of the employees, "the proceeding should thereupon have been dismissed". The supporting argument seems to be that where a majority in a unit have not designated a bargaining representative, "the only procedure would have been for the dissatisfied [minority] group of employees to present their grievances to respondent as provided in Section 9(a) of the Act [29 U.S.C.A. § 159(a)] * *", which gives the right to "any individual employee or a group of employees * * * at any time to present grievances to their employer."

This contention is not sound. The effect of the contention is that, until a majority of a unit had chosen a bargaining representative, the employer would be free to do whatever he wished to prevent the employees choosing such representative. Section 7 of the Act declares the right of self-organization; Section 8, 29 U.S.C.A. § 158, declares interference with that right to be an "unfair labor practice"; and Section 10, 29 U.S.C.A. § 160, empowers the Board to prevent "unfair labor practices". If a complaint covered only refusal to bargain with the Union, then a finding that the

Union did not represent a majority of the unit would dispose of the entire matter on the merits and dismissal of the complaint would follow. However, where the complaint covers other unfair practices, such as interference, intimidation, coercion, etc., a minority have a right to protection to the end that they, as well as other employees of the unit, may have their full rights under Section 7. Such right is not affected by failure to establish a majority bargaining agent.

### Cease and Desist.

Broadly stated, the cease and desist part of the order required respondent to abstain from all interference with free action of the employees in self-organization; and with particular reference to the Union.

This portion of the order was based upon four findings of the Board as follows: Hostile activity to the Union organization of employees by Oscar Grott, foreman of this maintenance department of respondent's business; spying upon such organization activities by Grott and by John A. Zenzen (shop clerk); avoidance and defeat of attempts by Union representative to carry on bargaining negotiations; and distribution of a circular entitled "A message to employees. Facts about the Wagner Act".

■ (1) *As to hostile activities of Grott.* He was foreman of this maintenance department, which was the unit for bargaining purposes declared by the Board and rightfully selected since this is a craft union. He did the hiring and firing of men in this department. The activities of Grott involved here consist of statements made by him to various employees. Very concisely expressed, these statements were: that the company would close its business before submitting to unionization; that he would discharge anyone joining the Union, if it were necessary to "hold his job"; that an employee, who had joined the Union, had better withdraw if he "knew what was good for him" or he "would be out of a job"; an intimation, to a Union member, that two men had been discharged for Union activity; an inquiry to one employee, at time of hiring, as to whether he belonged to a union with the statement that "he didn't believe in paying dues for someone to ride around in a swell car"; and, generally, questioning of various employees concerning their membership in the Union. This activity was distinctly hostile to the rights of the employees freely to organize and choose bargaining representatives. Being the foreman—head of department—over these men and having the power to terminate their employment, responsibility for these actions of Grott are to be attributed to respondent. National Labor Relations Board v. Link Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L. Ed. —— (decided Jan. 6, 1941); H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. —— (decided Jan. 6, 1941); International Association of Machinists, etc., v. National Labor Relations Board, 311 U.S. 72, 79–81, 61 S.Ct. 83, 85 L.Ed. ——. There was substantial evidence to support this finding of the Board.

■ *As to spying by Grott and Zenzen.* The evidence is as to the presence of these two men near the Union hall at a time, out of work hours, when some of these employees were there. This hall was not anywhere near the business place of respondent. The explanation of Grott as to why he and Zenzen were in that vicinity is not convincing and might well have been disbelieved by the Board. We think there was substantial evidence as to spying to support this finding of the Board.

■ The two findings just discussed are sufficient to sustain the cease and desist portions of the order. Since they are so sufficient, it would be merely unnecessary labor to discuss the two other findings. That portion of the order is upheld for enforcement.

### Affirmative Action.

The affirmative requirements of the order, here challenged, have to do with (1) reinstatement of Lupardus and of Walton; (2) reinstatement or preferential listing of striking employees; and (3) form of notice.

■ (1) *Reinstatement of Lupardus and of Walton.* The question is, as to each of these men, whether he was discharged for cause or for Union activities. We have carefully examined the evidence as to each man. We are convinced that the discharge of Lupardus was for good cause and that there is no substantial evidence that such discharge was for Union activities. While there is a decided conflict in the evidence as to Walton, we think there was substantial testimony to support the finding of the Board that Walton was discharged because of Union activities. We sustain the order as to Walton and deny it as to Lupardus.

(2) *Reinstatement or preferential listing of striking employees.* The Union began signing up employees late in April, 1937. The undisputed evidence shows and the Board found that the Union never had a majority of the employees in the unit as its members from June 17, 1937, to July 23, 1937. Although lacking such majority, a representative of the Union wrote respondent on June 17, 1937, that "As the representative of the truck mechanics employed by your company, I am submitting herewith a standard working agreement covering their employment" and suggesting discussion of the agreement at an early date. All efforts to arrange for such a meeting being unsuccessful, the representative again wrote, on July 16, 1937, that "As the duly chosen representative of your truck mechanics, I herewith submit a request for a conference to discuss with you the terms and conditions of a working agreement covering the employment of these men" and suggesting that failure to meet with the representative would leave no alternative but to file charges with the Board. Finally, the representative went to an office of respondent, the morning of July 23, 1937, where he met Brashear, president of respondent, and requested a conference to discuss "the agreement which he had proposed to respondent" in his letter of June 17th. Brashear then stated he was too busy to confer and that it would do little good, since he could not pay the wages requested. When the representative suggested discussion of the other features of the suggested agreement, Brashear stated (so the representative understood) "he was afraid that if he had a union in his repair shop, that at any time he was negotiating with the union on a union agreement he expected that the men would load his crank case or his crank cases or differentials or transmissions with asphalt and cripple his equipment when it got out on the road". Brashear said the contract was undesirable in its entirety. When it became evident to the representative that no meeting would materialize, he gave a signal to the men in the shop and most of those in the Union went out on strike at once and began picketing the plant.

■ ■ It is clear that the sole reason and occasion for this strike was the refusal to bargain with the representative of the Union. The Union membership never included a majority of the employees in the unit. There was no legal obligation to bargain with this representative of a minority. Even if the position of respondent, at the time of the refusal to bargain with a minority representative, was that it would not bargain with a union, yet such minority is in no position to strike because of failure to bargain with it and then receive compulsory reinstatement. Just as the employer, if he refused to bargain with the representative of a majority of a proper unit, acts at his peril; so a minority of the employes, who strike because the employer refuses to bargain with their representative, do so at their peril in so far as compulsory reinstatement is concerned. Under the finding of the Board that the representative was of a minority only of the proper unit and under the undisputed evidence that the sole reason for the strike was the failure to bargain with such representative, there was no substantial evidence to sustain that portion of the order requiring reinstatement or preferential listing of these striking employees.

■ (3) *Form of notice to be posted.* Respondent attacks this feature of the order because, it contends, such requirement compels respondent "to publicly post a notice acknowledging its guilt" when it has denied and sought to support its denial of such guilt. Such a controversy seems to us to be one of form rather than substance and rather trivial at best.

In National Labor Relations Board v. Express Publishing Co., 61 S.Ct. 693, 701, 85 L.Ed. —— (decided March 3, 1941), where there was a similar issue, the Court stated: "Since the Board has changed its practice and now provides in all orders that the employers' notices shall state 'that he will not engage in the conduct from which he is ordered to cease and desist' it consents that the present order be modified accordingly." The present order is that the notice shall state that respondent "will cease and desist in the manner aforesaid". While we deem the difference rather unimportant, we will, for uniformity, modify this provision so that the notices will read that respondent "will not engage in the conduct from which he [it] is ordered to cease and desist".

### Conclusion.

As modified by the foregoing statements in this opinion, the order of the Board will be ordered enforced.