# NATIONAL LABOR RELATIONS BOARD v. DRAPER CORPORATION.

## No. 5239.

Circuit Court of Appeals, Fourth Circuit.

Oct. 6, 1944.

200

Guy Farmer, Associate General Counsel, National Labor Relations Board, of Washington, D. C. (Alvin J. Rockwell, General Counsel, Malcolm F. Halliday, Associate General Counsel, Joseph B. Robison, and Dominick L. Manoli, Attorney, National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

L. W. Perrin, of Spartanburg, S. C., and O. A. Schlaikjer, of Boston, Mass. (Herrick, Smith, Donald, Farley & Ketchum and Warren D. Oliver, all of Boston, Mass., on the brief), for respondent.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

This is a petition to enforce an order of the National Labor Relations Board which directed the Draper Corporation to cease and desist from unfair labor practices, in violation of sections 8(1) and 8(3) of the National Labor Relations Act, 29 U.S.C.A. § 158(1, 3), at its Spartanburg, S. C. plant, and to make whole fifty-four of its employees for loss of wages resulting from discriminatory discharge and failure to reemploy. These employees had been reinstated by the company prior to the order and the wage order related to losses sustained prior to reinstatement. The complaint before the Board charged the company with unfair labor practices, (1) in connection with the circulation among its employees of petitions derogatory to a union which had been chosen as their bargaining representative, (2) in the discharge of certain striking employees and the failure to reemploy them and (3) in the failure to bargain in good faith with the union. The Board held that the charge of failure to bargain was not sustained by the proofs but that the other charges were sustained and entered the order appropriate to such findings.

There is little real dispute as to the controlling facts, which are fully set forth in the Intermediate Report of the Trial Examiner, attached to the Report of the

Board. They may be summarized as follows: In 1941 the union was chosen as bargaining representative of the employees of the company at its Spartanburg plant and entered into a contract with the company which was to last for the term of one year. A conference to negotiate a new contract was held on August 13, 1942, at which the union demanded, among other things, a closed shop and a 20 per cent wage increase. The company, while evincing a willingness to agree to a number of the union's proposals, would not agree to these; and the conference broke up when one of the officials of the company alluded to a petition of certain employees derogatory to union representation as possibly establishing a lack of bargaining authority on the part of the union. A complaint for failure to bargain was filed against the company but this was subsequently withdrawn and the company, giving unqualified recognition to the union as the bargaining representative of the employees, agreed that a conference to negotiate a contract be held with its representatives on October 8th, later changed to October 15th.

On October 14th, the union representative arrived in Spartanburg for the purpose of attending the conference and was advised that one Snieder, secretary of the company and its bargaining representative, was ill in Massachusetts and for that reason unable to attend the conference. Snieder was in fact ill, as the Board found; but some of the employees thought that his illness was feigned as an excuse for delay and became angry and resentful. Next morning forty-one of the foundry employees under the leadership of one Taylor, an officer of the union, gathered in a corner of the foundry building and failed to go to work at 7 o'clock, as they were supposed to do. When approached by the superintendent of the plant, they said that they were carrying on a "wild cat strike", that they considered that the company was "stalling" and that they wanted "action" and would get it. The superintendent ordered them to go to work, which they refused to do, and both he and the company's attorney, who had been called in the meantime, argued with them, telling them that they ought to return to work and that, if they did not do so, they would be discharged. Snieder was called over the 'phone by the superintendent, and, pursuant to instructions from him, the men were told either to go to work or to get out of the plant. They then retired to the locker room where they took a vote on whether to go out on strike or not and decided to do so by a vote of 28 to 13. The superintendent was notified of the result of the vote and the men departed peacefully without further ado. There was no violence at any time and no seizure of the company's property except such as may have been involved in the persistence of the 41 men, constituting 25 per cent of the total working force, in remaining in the plant and continuing the discussion, contrary to orders, for two hours while the plant was in operation. The next day the men were paid off in full and were given or were mailed settlement forms showing that they were discharged for engaging in a "sit down strike". The union, which the employees had chosen as bargaining representative, did not call or authorize the strike or sanction it in any way.

After the men had left the plant on October 15th, an offer was made in their behalf that they would return to work if they were assured that any wage increase which might be agreed upon as the result of negotiations would be made retroactive; but the company refused this offer. On October 19th the director of the United States Conciliation Service wired both sides asking that operations be resumed immediately and that the status quo prior to the work stoppage be maintained. The men agreed to this and all on strike presented themselves at the plant next morning October 20th. The company declined to permit those who had been discharged to return to work; and they and some other employees who were making common cause with them went away. Finally, on December 29th, the company agreed that all might return to work, and they were accordingly reinstated.

The number of men discharged on October 15th was forty-one. By mistake, however, a discharge notice for the same cause was mailed next day to one Mabry, who had not been working on the 15th, and he subsequently made common cause with the others. The company has offered to pay his wages from the time of his discharge until he was sent notice that he might return to work. Twelve other employees likewise joined the strikers. Three of these went to work on October 20th, thinking that all were returning to work, and worked for one day, but, on learning

202

that the discharged employees were not allowed to work, they did not return thereafter until all were taken back. In refusing to allow the discharged employees to return to work, the company did not refuse to allow others who had joined in the strike to return, and would have permitted them to work if they had presented themselves.

With respect to the circulation of the petitions, it appears that officers of the union complained, about two weeks in advance of the meeting of August 13th, that anti-union petitions were being circulated, whereupon the superintendent promised that this would not be allowed. On August 12th, however, it appears that an employee was engaged in circulating such a petition in the presence of one of the foremen, but it does not appear that the company had anything to do with its circulation or that it was called to the attention of the superintendent. A petition was circulated also on the 13th, but when complaint thereof was made to the superintendent, he reprimanded the employee for circulating it. In the conference on the 13th, the petitions were referred to by the secretary of the company as casting doubt on the right of the union to represent the employees, but the company subsequently recognized the union as the bargaining representative of the employees and efforts to negotiate a contract were resumed.

The principal question in the case is whether the discharge of the forty-one employees on October 15th and the subsequent refusal to reemploy them were unfair labor practices within the meaning of the National Labor Relations Act.

On behalf of the Board, it is argued that the employees who went on the "wild cat" strike were engaged in "concerted activities, for the purpose of collective bargaining or other mutual aid or protection", within the meaning of section 7 of the act, 29 U.S.C.A. § 157, and that the discharge and refusal to reemploy on this account was interference, restraint or coercion with respect to the right to engage in such concerted activities, denounced as an unfair labor practice by section 8(1) of the act, 29 U.S.C.A. § 158(1). It is argued also that the discharge and refusal to reemploy constituted "discrimination in regard to hire or tenure of employment * * * to encourage or discourage membership in any labor organization", con-demned as an unfair labor practice by section 8(3) of the Act, 29 U.S.C.A. § 158(3).

■ It is perfectly clear that, in the discharge and refusal to reemploy, there was no intent to discourage membership in any labor organization, within the meaning of section 8(3) of the act. The great majority of the employees, who were members of the union, continued to work; the company continued to recognize the union as the bargaining representative of its employees; the discharge and refusal to employ did not affect and could not have affected the status of the union as bargaining representative; and there is not a scintilla of evidence to support the conclusion that the discharge of the "wild cat" strikers or the refusal to reemploy them encouraged or discouraged membership in any labor organization or was intended to have any such effect. Western Cartridge Co. v. N. L. R. B., 7 Cir., 139 F.2d 855.

■ The question is narrowed, then, to whether what was done amounts to an unfair labor practice within section 8(1) of the act. This depends on whether or not the "wild cat" strike, in which the discharged employees were engaged, falls within the protection of section 7 of the act. If it does, a discharge on account thereof would clearly be interference and coercion with respect thereto within the meaning of section 8(1). Cf. Western Cartridge Co. v. N. L. R. B., supra. If it does not, the discharge and failure to reemploy would be justified and would furnish no basis for a finding of unfair labor practice.

■■ We pass the question as to whether the discharge of the employees was justified by the insubordinate conduct of standing around the plant and refusing to go to work when ordered (Cf. N. L. R. B. v. American Mfg. Co., 2 Cir., 106 F.2d 61, 68; N. L. R. B. v. Condenser Corp. of America, 3 Cir., 128 F.2d 67, 77), because we are of opinion that the "wild cat" strike in which the employees were engaged and for which they were discharged was not such a concerted activity as falls within the protection of section 7 of the National Labor Relations Act, but a strike in violation of the purposes of the act by a minority group of employees in an effort to interfere with the collective bargaining by the duly authorized bargaining agent selected by all the employees. The

purpose of the act was not to guarantee to employees the right to do as they please but to guarantee to them the right of collective bargaining for the purpose of preserving industrial peace. The policy of the act is thus set forth, 29 U.S.C.A. § 151: "The denial by employers of the right of employees to organize and the refusal by employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent or the necessary effect of burdening or obstructing commerce. * * * It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection."

It is perfectly clear not only that the "wild cat" strike is a particularly harmful and demoralizing form of industrial strife and unrest, the necessary effect of which is to burden and obstruct commerce, but also that it is necessarily destructive of that collective bargaining which it is the purpose of the act to promote. Even though the majority of the employees in an industry may have selected their bargaining agent and the agent may have been recognized by the employer, there can be no effective bargaining if small groups of employees are at liberty to ignore the bargaining agency thus set up, take particular matters into their own hands and deal independently with the employer. The whole purpose of the act is to give to the employees as a whole, through action of a majority, the right to bargain with the employer with respect to such matters as wages, hours and conditions of work. Section 9 of the act, 29 U.S.C.A. § 159, provides: "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the *exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment:* Pro-

vided, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer." (Italics supplied.)

A union selected as bargaining agent is thus made the exclusive representative of all the employees for the purpose of collective bargaining. As said in Virginian R. Co. v. System Federation, 300 U.S. 515, 548, 57 S.Ct. 592, 600, 81 L.Ed. 789, the law "imposes the affirmative duty to treat only with the true representative, and hence the negative duty to treat with no other." See also McQuay-Norris Mfg. Co. v. N. L. R. B., 7 Cir., 116 F.2d 748; Texarkana Bus Co. v. N. L. R. B., 8 Cir., 119 F.2d 480, 484; North Electric Mfg. Co. v. N. L. R. B., 6 Cir., 123 F.2d 887, 890. The employees must act through the voice of the majority or the bargaining agent chosen by the majority. Minority groups must acquiesce in the action of the majority and the bargaining agent they have chosen; and, just as a minority has no right to enter into separate bargaining arrangements with the employer, so it has no right to take independent action to interfere with the course of bargaining which is being carried on by the duly authorized bargaining agent chosen by the majority. The proviso to section 9 above quoted, preserving to individuals or groups of employees the right to present grievances to the employer, negatives by necessary inference the right on their part to call strikes for the purpose of influencing the bargaining being carried on by the chosen representatives of all the employees.

Very much in point is the decision of the Eighth Circuit in N. L. R. B. v. Brashear Freight Lines, 8 Cir., 119 F.2d 379, 382. In that case a minority of employees went on a strike because the employer would not recognize and bargain with a union representing the minority. There, as here, there was a strike by a minority because the employer did not accede to their demands. In holding that a Board order directing the reinstatement of the striking employees would not be enforced, the Court, speaking through Judge Stone, said: "It is clear that the sole reason and occasion for this strike was the refusal to bargain with the representative of the Union. The Union membership never included a majority of the employees in the unit. There was no legal obligation to bargain with this representative of a minority. Even if the position of respondent, at the

time of the refusal to bargain with a minority representative, was that it would not bargain with a union, yet such minority is in no position to strike because of failure to bargain with it and then receive compulsory reinstatement. Just as the employer, if he refused to bargain with the representative of a majority of a proper unit, acts at his peril; so a minority of the employes, who strike because the employer refuses to bargain with their representative, do so at their peril in so far as compulsory reinstatement is concerned. Under the finding of the Board that the representative was of a minority only of the proper unit and under the undisputed evidence that the sole reason for the strike was the failure to bargain with such representative, there was no substantial evidence to sustain that portion of the order requiring reinstatement or preferential listing of these striking employees."

There is stronger reason in the case at bar than in the Brashear Freight Lines case for holding that the striking minority are not protected from discharge by the provisions of the act. The particular grievance which led to the strike by the minority here was the failure of the employer to go forward with the bargaining which had been arranged by the representative of all the employees. The effort of the minority was thus to take the bargaining out of the hands of the legally chosen representatives and proceed with it themselves; and if a discharge, as in the Brashear case, is justified, where a minority of employees, in the absence of a bargaining agent, go on strike because of the refusal of the employer to deal with them, certainly the discharge is justified where the only reason for the strike is the refusal to deal with a minority which is seeking to usurp the functions of the agent chosen by the majority.

Support for this conclusion is found in our decision in the Hazel-Atlas Glass Co. v. N. L. R. B., 4 Cir., 127 F.2d 109, and the decisions of the Supreme Court in N. L. R. B. v. Sands Mfg. Co., 306 U.S. 332, 344, 59 S.Ct. 508, 83 L.Ed. 682, and N. L. R. B. v. Fansteel Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599, which, while not precisely in point, lay down the propositions as stated in the Fansteel Corp. case, 306 U. S. at page 254, 59 S.Ct. at page 495, 83 L.Ed. 627, 123 A.L.R. 599, that the act " 'does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them'; that the employer 'may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation; and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion.' " In the Sands Mfg. Co. case, supra, the Supreme Court said [306 U.S. 332, 59 S.Ct. 514, 83 L.Ed. 682]: "The Act does not prohibit an effective discharge for repudiation by the employe of his agreement, any more than it prohibits such discharge for a tort committed against the employer." While the striking employees here were not guilty of a breach of agreement not to strike, as in the Sands Mfg. Co. and Hazel-Atlas Glass Co., cases, supra, they were guilty of interfering with the collective bargaining, which was being carried on by their duly authorized agent, in violation of the collective bargaining agreement entered into with the company. When the union was selected by the employees and recognized by the company as bargaining agent, it was understood and agreed on all sides that bargaining with respect to wages, hours and conditions of work would be carried on between the union and the company in accordance with the above quoted statutory provision, that the employees would acquiesce in action taken by the union and that they would not undertake independent action with respect to the matters they had committed to it as their authorized agency. Not only did the company agree to bargain only with the union, but the employees agreed to bargain only through the union. Those who engaged in the "wild cat" strike violated this agreement.

We have noted the expression in the opinion in Western Cartridge Co. v. N. L. R. B., supra, 7 Cir., 139 F.2d 855, to the effect that discharge for engaging in what was in effect a "wild cat" strike would constitute a violation of section 8(1) of the act. The question in that case, however, was whether what was done amounted to a violation of section 8(3), and there was no decision to the effect that it constituted a violation of section 8(1). What was said with respect to violation of section 8(1), therefore, was said by way of dictum and no consideration was given to the questions which we have discussed here.

■ It should be noted that a "wild cat" strike in violation of the purposes of the act and of an agreement existing between the employer and employees for orderly collective bargaining is clearly distinguishable from a strike which, although not justified, nevertheless accords with the rights of the parties under the National Labor Relations Act. Such a strike was before the Court in N. L. R. B. v. Mackay Radio & Tel. Co., 304 U. S. 333, 344, 58 S.Ct. 904, 82 L.Ed. 1381. There, the strike was called by the union representing the employees; here the strike was called and carried on by an irresponsible minority in defiance of the bargaining union. We do not mean to say, of course, that a strike can be called only by a bargaining union, or that less than a majority of employees will not be protected when they go on strike in protection of their rights. See Firth Carpet Co. v. N. L. R. B., 2 Cir., 129 F.2d 633. What we do mean to say is that minorities who engage in "wild cat" strikes, in violation of rights established by the collective bargaining statute, can find nothing in that statute which protects them from discharge. In the absence of the statute, there was nothing in the law which forbade the discharge of strikers. There is nothing in the statute, properly construed, which protects from discharge those who strike in defiance of its provisions. No surer way could be found to bring collective bargaining into general disrepute than to hold that "wild cat" strikes are protected by the collective bargaining statute.

It is true, of course, that the National Labor Relations Act is not to be construed to interfere in any way with the right to strike. Section 13 of the act, 29 U.S.C.A. § 163, expressly so provides. What is involved here, however, is, not the right to strike, but the right of the employer to discharge employees who have engaged in insubordinate conduct violative of the statutory provisions for collective bargaining.

Since those engaged in the "wild cat" strike were not protected from discharge and their reinstatement was not required, there was no basis for the finding of an unfair labor practice on the part of the company with respect to the discharge and refusal to reemploy, or for the order awarding reimbursement of pay for time lost in the strike. This is true, of course, not only as to the men who were discharged, but also as to those who joined their strike and made common cause with them. As to the latter, the evidence shows without contradiction that except as to the one discharged by mistake, the company at no time discharged them or refused to allow them to work. There is no basis for a finding of any unfair labor practice as to any of them.

■ And there is no substantial evidence of any sort with respect to an unfair labor practice in the circulation of the anti-union petitions. There is not a scintilla of evidence that the company had anything to do with their circulation, and when the attention of the superintendent was called to the fact that an employee was circulating one, he reprimanded him for it. The fact that the secretary of the company may have mentioned petitions which had been filed with it as indicating that the union was probably no longer authorized to represent the employees does not tend to connect the company with the circulation of the petitions. It does no more than create a suspicion at the most; and in view of the uncontradicted evidence of denial, and with nothing more to connect the company with the circulation, even the suspicion vanishes.

■ The Board has absolved the company of the charge of refusal to bargain in good faith; and we think, for the reasons stated, there is no foundation in the record for the other unfair labor practices charged against it. The company placed itself in an unenviable position when it refused to accede to the request of the Conciliation Commissioner that it put the men who had been discharged back to work; but we cannot say, in the light of the law as we understand it, that it was guilty of an unfair labor practice in that connection.

The petition for enforcement will be denied.

Petition denied.