## NATIONAL LABOR RELATIONS BOARD v. ILLINOIS BELL TEL. CO.

No. 10305.

United States Court of Appeals Seventh Circuit.

Heard April 23, 1951.

Decided May 21, 1951.

---

David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, N.L.R.B., Washington, D. C., Robert E. Ackerberg, National Labor Relations Board, Chicago, Ill., George J. Bott, Associate General Counsel, Frederick U. Reel, and Maurice Alexandre, Attorneys, National Labor Relations Board, all of Washington, D. C., for petitioner.

Kenneth F. Burgess, Howard P. Robinson, Gordon W. Winks, and Arthur R. Seder, Jr., all of Chicago, Ill., Sidley, Austin, Burgess & Smith, Chicago, Ill., of counsel, for respondent.

Before MAJOR, Chief Judge, and KERNER and SWAIM, Circuit Judges.

MAJOR, Chief Judge.

This is a petition by National Labor Relations Board (hereinafter called the Board) for enforcement of its order issued against respondent, Illinois Bell Telephone Company, on March 16, 1950, following the usual proceedings in such cases. Respondent denies the validity of the order and requests that enforcement be denied.

The case has to do with the demotion by respondent of eight supervisory employees [1] because of certain activities under circumstances hereinafter set forth. The Board concluded that such employees were engaged in a concerted activity protected by § 7 of the Act, 29 U.S.C.A. § 157, and that respondent's action violated § 8(1) of the Act, 29 U.S.C.A. § 158(1), and "because such a demotion amounts to a discrimination in hire and tenure of employment and thereby discourages membership in a labor organization it also violates Section 8(a) (3) of the Act."

The issues for decision are in the main legal in their nature because there is little, if any, dispute in the evidentiary facts. To bring such issues into focus, however, it appears necessary to make a rather detailed statement of the facts. Respondent, an Illinois corporation with its principal office in Chicago, Illinois, is engaged in the communications industry, rendering tele-

---

1. The employees demoted were Frances Regan, Lillian Jensen, Edith Holmes, Irene Keuther, Helen Marcellaio, Rose Winder, Catherine Brophy and Dorothy Jungbluth Whether they were supervisory employees within the contemplation of the Act is open to question. The Board takes the position, under the circumstances of the case, that it is immaterial, and we shall do likewise.

phone service both within and without the State of Illinois. The unions involved in the proceeding, directly or indirectly, are Illinois Telephone Traffic Union (called I.T.T.U.) and Chicago Telephone Traffic Union (called C.T.T.U.). The membership in the former in the main consisted of those employed in the State outside of the boundaries of Chicago; the latter represented those employed within the City of Chicago. The former, as the duly designated bargaining agent for the employees in the State area, had a contract with respondent which expired on or about March 1, 1947. On April 7, 1947, that union commenced an economic strike against respondent to obtain changes in working conditions, as well as a wage increase. Picket lines were set up at respondent's installations throughout the State area, and also at all exchanges within the Chicago area, on the morning of April 7. The strike lasted through May 8, 1947, and picket lines were maintained at all central office exchanges within the Chicago area until that time.

The C.T.T.U. was the duly designated bargaining agent for respondent's employees in the Chicago area, including those involved in this proceeding. This union also had a contract with respondent, entered into on July 25, 1946, which expired March 29, 1947. On March 25, 1947, C.T.T.U. and respondent signed an "Extension Agreement" extending the old agreement until April 28, 1947. Another "Extension Agreement" was entered into on April 25, 1947, extending the old agreement to June 2, 1947, and a new contract was signed on May 15, 1947. As the Trial Examiner stated, "C.T.T.U. did not engage officially or unofficially in the strike commenced by I.T.T.U. on April 7, 1947 but, as appears above, it met with Respondent during the strike period and ultimately signed a new contract on May 15." The record does not disclose the number of respondent's employees who were members of these respective unions; however, the contract entered into between respondent and C.T.T.U. in July, 1946, recites that not less than 6,000 employees were members of that union in good standing. It appears that some of the involved employees held

membership in both unions at the time of the strike. Seven were members of the striking union, three were members of C.T.T.U., and one was not a member of either; however, as stated, all eight employees were in the bargaining unit represented by C.T.T.U.

As noted, I.T.T.U. commenced an economic strike against respondent on April 7, 1947, and established picket lines not only at respondent's installations throughout the State area but also at respondent's installations throughout the Chicago area represented by C.T.T.U., and also as noted, C.T.T.U. did not participate in any way in the strike. At that time, it was engaged in bargaining with respondent for a new contract. On April 8, the eight employees involved, without any previous notice or warning to respondent, failed to report for work because of their refusal to cross the picket line of the striking union. Subsequently, respondent, upon inquiry, was told by the employees that this was the reason for their refusal to work. As witnesses before the Trial Examiner, they testified to the same effect. Typical of such testimony is that of Miss Jungbluth, "I didn't want to come in because there was a picket line and I didn't believe in crossing the picket line"; Miss Marcellaio, "I saw the picket line and I went home"; Miss Keuther, "As a union member and also as an American citizen, I said, I feel it is my duty to respect a picket line." Miss Holmes did not approach the picket line but by telephone from her home learned that there were pickets in front of the office and refused to come to work "until after the pickets have been removed."

On April 11 and 12, 1947, respondent directed a letter to each of the involved employees in which they were told that their jobs would be placed in jeopardy by a continued absence from work, that they were being demoted from their authority as supervisor to that of operator, and that their employment would be suspended as of the first day they failed to report for the new assignment. Respondent during the time of the absence of these employees arranged to have their work performed by utilizing its replacement supervisors, by recalling

regular supervisors who were off duty, and in general by reallocating the work of its force of telephone supervisors. At the termination of the I.T.T.U. strike on May 8, 1947, the pickets were removed. The following day, or shortly thereafter, the demoted employees reported for work and each was assigned to the position and duties of a telephone operator. The salary paid an operator was lower than that received by a supervisor.

It was the demotion of these eight employees by respondent which the Board found to be a violation of §§ 8(1) and 8(3) of the Act. On this premise the Board's order requires respondent to cease and desist from discouraging membership in Illinois Traffic Division 14, C.W.A. (successor of I.T.T.U.) or any other labor organization of its employees, by discriminating in their employment and in any like or related manner from coercing its employees of the right guaranteed by § 7 of the Act. And respondent was required to offer the eight employees reinstatement to their former positions as telephone supervisors, to make them whole for any loss in wages, pension rights or sick benefits which they suffered as a result of their demotions, and to post appropriate notices.

The crucial issue, as we view the situation, is whether the eight employees were protected by § 7 of the Act. If so, the finding of an unfair labor practice and the order resulting therefrom is sustainable; otherwise, not. That section provides, 29 U.S.C.A. § 157: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection".

It is the Board's theory that the eight employees were engaged in "concerted activities" for their "mutual aid or protection." The Board terms the activities of the eight employees a "strike," while respondent labels it as a "wildcat strike." In our view, it was not a strike in any ordinary connotation of that term. This court, in C. G. Conn v. N.L.R.B., 7 Cir., 108 F.2d

390, 397, accepted the definition of a strike as contained in American and English Encyclopedia of Law, Volume 24, page 123, as follows: "The term 'strike' is applied commonly to a combined effort on the part of a body of workmen employed by the same master to enforce a demand for higher wages, shorter hours, or some other concession, by stopping work in a body at a prearranged time, and refusing to resume work until the demanded concession shall have been granted."

While the Labor Management Relations Act of 1947 is inapplicable because the events in controversy took place prior to its enactment, it is interesting to note that § 142 provides: "The term 'strike' includes any strike or other concerted stoppage of work by employees * * * and any concerted slow-down or other concerted interruption of operations by employees."

There is no evidence that these eight employees acted in combination or concert. They did not converse with each other or any other person regarding the activity in which they engaged, that is, a refusal to cross the picket line. The record discloses unmistakably that each acted in her own individual capacity. The Board in its brief states, "Their only concern was to help the I.T.T.U." Even that concession is the result only of a dubious inference. None of the involved employees testified to any such concern. Their testimony discloses that their refusal to cross the picket line was a matter of principle, and that it would have made no difference whether the picket line was maintained by I.T.T.U. or some other union. The Board in its brief states that these employees "had no grievance which could have been adjusted through grievance procedures. The object behind their refusal to cross the picket line was merely to support the grievance of others." And at another point the Board states, "Here, there was no controversy between respondent and the C.T.T.U.; the complainants merely refused to cross the I.T.T.U. picket lines to support the demands of the I.T. T.U. rather than their own grievances."

Assuming, however, contrary to what we think, that the involved employees engaged in "concerted activities," we are unable to

discern from this record, and particularly in view of the concessions made by the Board, how it can be held that such activities were for their "mutual aid or protection." They neither sought nor were entitled to seek on their own behalf any aid or protection from respondent. That was the sole function of C.T.T.U., the duly selected and existing bargaining representative for the unit of which the involved employees were a part. The Board in its brief concedes, "These agreements [those between respondent and C.T.T.U.] bound the employees to work in conformity with the wages, hours, and working conditions provided in them. Employees dissatisfied, for example, with their wages were not entitled to seek to revise them by strike action before the expiration of their agreements." In other words, these employees were without right to bargain with respondent or to strike because of any grievance which they had or for their own aid or protection, but they had such right, according to the Board, in behalf of employees of a different unit and represented by a different bargaining agent.

So far as we are aware, no court has passed upon the precise question here involved; however, there are numerous cases where it has been held under a variety of circumstances that concerted activities by a group of employees were not protected by § 7 of the Act. Southern Steamship Co. v. N.L.R.B., 316 U.S. 31, 46, 62 S.Ct. 886, 86 L.Ed. 1246; N.L.R.B v. Sands Mfg. Co., 306 U.S. 332, 344, 59 S.Ct. 508, 83 L.Ed. 682; N.L.R.B. v. Reynolds International Pen Co., 7 Cir., 162 F.2d 680, 683; N.L.R.B. v. Draper Corp., 4 Cir., 145 F.2d 199, 202; Joanna Cotton Mills Co. v. N.L.R.B., 4 Cir., 176 F.2d 749, 752.

No good purpose could be served in a detailed analysis of these and other cases which could be cited. The case most nearly in point is that of N.L.R.B. v. Draper Corp., 4 Cir., 145 F.2d 199. There, as here, the company was bargaining with a union as a representative of its employees. While so engaged, a number of the employees ceased work in what is referred to as a "wildcat strike." The discharge of such employees was found by the Board to be an unfair labor practice, but the court denied enforcement of its order. The Board before that court argued, as it does here, that the employees who went on strike were engaged in concerted activities for their "mutual aid or protection." The court in denying such contention stated, 145 F.2d at page 202: "* * * we are of opinion that the 'wild cat' strike in which the employees were engaged and for which they were discharged was not such a concerted activity as falls within the protection of section 7 of the National Labor Relations Act, but a strike in violation of the purposes of the act by a minority group of employees in an effort to interfere with the collective bargaining by the duly authorized bargaining agent selected by all the employees. The purpose of the act was not to guarantee to employees the right to do as they please but to guarantee to them the right of collective bargaining for the purpose of preserving industrial peace."

And on the following page: "Even though the majority of the employees in an industry may have selected their bargaining agent and the agent may have been recognized by the employer, there can be no effective bargaining if small groups of employees are at liberty to ignore the bargaining agency thus set up, take particular matters into their own hands and deal independently with the employer. The whole purpose of the act is to give to the employees as a whole, through action of a majority, the right to bargain with the employer with respect to such matters as wages, hours and conditions of work."

In distinguishing the Draper case, the Board states, "In this case, the concerted activity engaged in bore no relationship to the then current bargaining negotiations between the C.T.T.U. and respondent." We think that is a questionable statement. It may be that the activities had no appreciable effect upon bargaining negotiations then in progress but, if so, it was only because of the small number of employees who were participants (1%, so it is stated in respondent's brief). But suppose it had been 10%, or 50%, of those in the bargaining unit represented by C.T.T.U.

Under such circumstances, could it be held that the cessation of work by such a large proportion of members of the unit would not seriously interfere with the prerogatives which the Act confers upon the agent selected to represent it? Not only would the authority of the bargaining agent be impaired under such circumstances, but any contract entered into would be of little value. Such activities by a large group would clearly be in derogation of the authority of the bargaining agent and would not be protected by § 7. And we discern no reason why a small group of employees (eight, in the instant case) would be entitled to the protection of the Act for activities which, if indulged in by a larger group, would be unprotected.

In J. I. Case Co. v. N.L.R.B., 321 U.S. 332, 339, 64 S.Ct. 576, 581, 88 L.Ed. 762, the court made the following pertinent observation: "The workman is free, if he values his own bargaining position more than that of the group, to vote against representation; but the majority rules, and if it collectivizes the employment bargain, individual advantages or favors will generally in practice go in as a contribution to the collective result."

The Trial Examiner in his findings, referring to the refusal of the involved employees to cross the picket line, stated, "By so doing these eight employees placed themselves in the position of sympathy strikers who made common cause with those engaged in the economic strike against their common employer. As a result, their legal status became identically that of the striking employees of the ITTU State unit, namely economic strikers." We think it is a novel theory that the mere refusal to cross a picket line, in the absence of any other activity, makes the one who refuses a party to the strike, but even so, as already shown, such refusal was not for the "mutual aid or protection" of the employees involved. It could have only been for the benefit and aid of those in a different bargaining unit, the representative of which could not have represented the involved employees and, consequently, could have obtained nothing from respondent for their benefit.

The unreasonableness of the Board's decision is emphasized by its order wherein respondent is directed to cease and desist from "interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to form labor organizations, to join or assist Illinois Traffic Division 14, Communications Workers of America, successor of Illinois Telephone Traffic Union, N.F.T.W., or any other labor organization, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, or to refrain from any or all of such activities * * *."

Other than the incidents which we have discussed, there is not a scintilla of proof that respondent interfered in any form or manner with the right of its employees to join a labor organization of their own choice, or that it refused to bargain collectively with the agents selected by such employees. In fact, the record indisputably demonstrates that respondent bargained with C.T.T.U. in good faith, with a resultant contract, and it also bargained with the striking union, with a like result. There is no evidence of any hostility or favoritism on behalf of respondent against or for any union. Aside from what we have heretofore said, the Board is not entitled to enforcement of the broad, sweeping terms of the order presented. Cf. Interlake Iron Corp. v. N.L.R.B., 7 Cir., 131 F.2d 129, 134; Western Cartridge Co. v. N.L.R.B., 7 Cir., 139 F.2d 855, 858.

The petition for enforcement of the Board's order is denied.