**NATIONAL LABOR RELATIONS BOARD v. AMERICAN MFG. CO. OF TEXAS.**

No. 14249.

United States Court of Appeals Fifth Circuit.

April 8, 1953.

T. Lowry Whittaker, Asst. Gen. Counsel, NLRB, A. Norman Somers, Asst. Gen. Counsel and David P. Findling, Assoc. Gen. Counsel, Washington, D. C., George J. Bott, Gen. Counsel, Elizabeth W. Weston and Ruth V. Reel, Washington, D. C., for petitioner.

Karl H. Mueller, Ft. Worth, Tex., Harold E. Mueller, Fort Worth, Tex., for respondent.

Before HUTCHESON, Chief Judge, and HOLMES and RIVES, Circuit Judges.

RIVES, Circuit Judge.

This is a petition by the National Labor Relations Board for enforcement of an order issued against respondent, American Manufacturing Company of Texas, on February 21, 1952. The Decision and Order of the Board are reported at 98 N. L. R. B. 48.

The material facts relating to the present controversy, as found by the Trial Examiner and the Board, may be summarized as follows:

On January 13, 1950, the United Steelworkers of America, CIO, (hereafter called the Union) was certified as the collective bargaining agent for respondent's production and maintenance employees, replacing the International Association of Machinists, which had for several years previous thereto represented the employees under a contract with respondent. Following its certification, the Union was recognized by respondent and bargaining negotiations were begun as to the terms of a contract. On February 27, 1950, while negotiations were continuing and before a formal grievance procedure had been established, a grievance arose in respondent's .foundry concerning the operation of "rattlers"[1] on the day or first shift. Respondent had previously operated its rattlers only on the second and third shifts, when the coremakers and most other employees having daytime duties in that area were not at work. In late February, however, respondent had on hand in its foundry a large surplus of castings awaiting rattling, and Foundry Foreman William Sanders, on instructions from Plant Superintendent Lott, ordered that the rattlers be placed in operation dur-

[1] "Rattlers" are machines commonly used in foundry operations and are described as revolving vessels in which metal castings are placed and rotated so as to smooth their surfaces and remove sand. Respondent had three such rattlers in its foundry, one large and two small ones.

ing the day shift on February 27. When the rattling operation began at about 12:30 p. m. on that day, a number of coremakers in the area complained immediately to a fellow coremaker, Joseph Robinson, who was president of the "local union".[2] Robinson reported the grievance to Lee Metker, the International staff representative of the Union and certified bargaining agent for the employees. That afternoon, immediately before a regularly scheduled bargaining conference was convened, Metker, in the presence of Robinson and other members of the local union's negotiating committee, advised Plant Superintendent Lott of the employees' complaint.[3] Superintendent Lott disclaimed any knowledge of the situation, but promised to investigate and let Metker know his reaction to the controversy. In any event, it is without dispute that the "rattler" grievance was allowed to rest for that time, and no further discussion of it was held during the conference, when certain health and safety provisions in the contract between respondent and the Union were agreed upon.[4] The rattlers continued to operate that day until near the end of the day shift.

On the morning of February 28, 1950, castings were again loaded into the rattlers in preparation for continued operations. Robinson thereupon inquired of Foreman Sanders whether Superintendent Lott had spoken to him about operating the rattlers on the day shift. Sanders replied in the negative, whereupon Robinson repeated to him the substance of the complaint made by Metker to Lott the day before regarding the noise, dust and danger from the rattling operation. Sanders replied that the work must go on. The rattlers were not placed in operation immediately, but about 12:30 p. m. Sanders notified Robinson that he planned to start them about 3 p. m. Robinson said nothing further at that time, but during the noon hour a group of about twenty foundry employees, including the twelve dischargees here involved, met and agreed that, if the rattlers were again started during the day shift, they would

2. It is without dispute that when the Union (United Steelworkers of America, CIO) was certified, no plant local of that Union had been chartered or was officially existent. The term "local union", as here used, admittedly refers to a group of employees who identified themselves with the Union, and had selected officers and a negotiating committee of some sort to function during the interim before the local union was formally organized. Metker, the International Union Representative, testified that he had been assigned to the controversy by an officer of the United Steelworkers of America, CIO, about January 10, 1950, and that he handled the representation of the local union until about July 20, 1950.

3. In this connection, Metker testified:
"I told Ed Lott I had a problem I wanted to discuss with him about conditions up in the shop, inasmuch as the Committee passed it on to me, and I promised to take it up with them and I was following through on what I promised the Committee. * * * The boys were pretty well concerned about the thing, because, as they told me, it created hazardous working conditions inasmuch as the dust and stuff coming out of those rattlers, they breathed this stuff, iron dust, sand dust, which contained some silicate, as I understand; and also the noise, that made it hazardous to work in, around, or about those things. I asked him if it was absolutely necessary, all of a sudden, to start running those things, and how often he felt it would have to be done. And Mr. Lott apprised me he had no knowledge of the situation existing in the foundry at that time and promised to check into it and let me and the Committee know about the matter. And he made some kind of notes in his little black book. Just what the notes were, I don't know."

4. Among others, respondent and the Union then agreed upon the following provision:
"The Company will make all reasonable and proper provisions for the safety and health of the employees while at the plant during the hours of their employment * * * The Company will continue to provide protective devices being furnished by it at the time of the execution of this agreement.
"Dangerous conditions or practices shall be called to the attention of the Company immediately. They shall be investigated promptly, and necessary corrective measures taken within a reasonable time."

leave their jobs in protest and meet in an alley outside the foundry, which was on company property.

About 2:30 p. m. one or two of the smaller rattlers located in the cleaning room, which was separated from the coremaking area by a partition of sheet metal and wire mesh, were again placed in operation. In accordance with their prearranged plan the twenty foundry employees left their work and walked out into the alley. Foreman Sanders followed to inquire why they were not working and Robinson, as spokesman for the group, reiterated that respondent's practice of operating the rattlers during the day shift created dangerous and unhealthy conditions, under which the men were not willing to work. Sanders agreed to cut off the rattlers if the men returned to their jobs. About 2:45 p. m. the rattlers were stopped and the men returned to their work. Foreman Sanders reported the incident to Superintendent Lott, who came to the foundry and, after some investigation, had one of the smaller rattlers again turned on. Twelve of the twenty employees who had walked out earlier that afternoon again arose and left the building, gathering together as they had before in the alley outside the foundry building on company property. Superintendent Lott followed the group and inquired of Robinson what objections the employees had to the continued operation of the rattler. Robinson again replied that the rattler was noisy, dusty, and unsafe, but added that if Lott desired to discuss the grievance, he would assemble the local union committee for the purpose of conferring with Lott and working out a

peaceful solution. Lott replied, "Well, for right now, either go back to your jobs and go to work or you will be removed from the payroll". When Robinson declared that the men would not work with the rattlers running,[5] Lott instructed Sanders to have their time cards removed from the rack, which action was equivalent to discharge. Robinson immediately made the rounds of the plant to notify the rest of the local union negotiating committee as to what had occurred, and as the employees left respondent's premises, it was announced that a meeting of the local union would be held later that afternoon. At the meeting the membership voted to strike in support of the twelve coremakers who had been discharged. The strike began on March 1st and lasted until the morning of March 15, 1950, during which time respondent continued to operate behind picket lines with approximately 30 per cent of those workers employed on February 28th and who did not honor the strike, and about seventy-three replacements for the striking employees.

The international officers of the Union, who had not authorized the strike in advance, later ratified and approved it, and international staff representative Metker sought a meeting with respondent for the purpose of negotiating a settlement. Two proposals for settling the strike submitted by the International Union on March 6th and March 11th were rejected by respondent,[6] and on March 15th the membership of the local union voted to call off the strike and apply unconditionally for their old jobs. There is evidence that, while the

5. With regard to the danger, dust, and noise complained of, the evidence shows that any danger was not imminent, that a "wetting down" process, used by respondent when the dispute arose, had effectively eliminated the dust, and that only the noise apparently unavoidable remained as a substantial source of annoyance. Moreover, many other employees, some more immediately affected than these twelve discharged coremakers, remained on the job with the rattlers operating.

6. The Union proposal of March 6th required that all employees be returned to work immediately "without reservation

or qualification", while the proposal of March 11th required that respondent return to work all employees except Robinson, whose case was to be adjudicated by the Board as a test case to determine whether the other discharged coremakers were entitled to reinstatement. Respondent rejected both proposals on the basis that it would not reinstate the twelve coremakers it had discharged or those employees guilty of misconduct on the picket line, nor would it discharge employees hired as replacements during the strike to make room for the returning strikers.

representative of the International Union was attempting to negotiate a settlement of the strike, several of respondent's foremen solicited individual strikers to discontinue their union activity,[7] and further, that respondent, at the end of the strike, did not fully reinstate a number of the striking employees to the same or substantially equivalent positions they had held prior to the strike.

The Board found that respondent violated Section 8(a) (1) and (3) of the Act, 29 U.S.C.A. § 158(a) (1) and (3), by discharging and refusing to reinstate the twelve coremakers who walked off their jobs in protest of the "rattler" grievance; that respondent further violated the Act by denying reinstatement to forty unfair labor practice strikers who engaged in the plantwide strike in protest of the coremakers' discharge; and that, through unlawful solicitation of its employees by its foreman during the strike, respondent had interfered with, restrained, and coerced its employees in the exercise of their rights, in violation of Section 8(a) (1) of the Act, 29 U.S.C.A. § 158(a) (1).

Both respondent and the Board concede that the controlling issue for determination is whether the work stoppage of the twelve discharged coremakers on February 28, 1950, was a concerted activity protected under the Act. If it was, as the Board contends, then their discharge was an unfair labor practice, the strike which followed was an unfair labor practice strike rather than an economic strike, and the

forty employees were unlawfully denied full reinstatement. Conversely, if respondent's discharge of these twelve employees was lawful, as respondent contends, the resulting strike was an economic strike, and the Board's order with respect to reinstatement and back pay of the employees involved is erroneous and may not be enforced.

▓ Here, the twelve discharged coremakers, only the afternoon before their walkout, had already referred the "rattler" grievance to their certified bargaining representative, Metker, who had brought it to the attention of respondent's plant superintendent in their behalf, and in the hope of reaching an amicable settlement of the dispute. Respondent did not then arbitrarily reject their grievance but, to the contrary, Superintendent Lott "promised to look into it and let Metker know", whereupon "the Union (International) allowed the grievance to rest there * * *."[8] Cf. N. L. R. B. v. Condenser Corp. of America, 3 Cir., 128 F.2d 67. The health and safety provision of the contract agreed upon between respondent and the International Union that same afternoon allowed respondent "a reasonable time" within which to investigate "dangerous conditions or practices" and take "necessary corrective measures".[9] We think that the action of these twelve dischargees was inconsistent with the understanding between Metker and Lott, as well as with the safety provisions of the contract (footnote 4, supra). Though Section 9(a) of the Act, 29 U.S.

7. The testimony in this regard reveals that on February 28th Foreman Frank Emmons told employee W. A. Francis, as he was leaving the plant after the discharge of the twelve coremakers, that he was "just a step" from being supervisor and whatever decision he made with respect to the strike would have a bearing on his future with respondent. Two days later Emmons telephoned Francis that he had communicated with another employee who was coming back and asked Francis to return also. On March 1st, the day picket lines were set up, Foreman Clay approached three employees in a car outside the plant and told them their jobs were waiting inside if they cared to go in. On March 13th, Clay wrote a note to an employee urging him to return to work and stating, "I don't know how long I can hold your job. We have four men in your department now." On March 15, Foreman Gillard stood outside the gate near the pickets and encouraged them to abandon the picket line and enter the plant.

8. The Trial Examiner and the Board so found.

9. It would appear that such a complaint as the one here involved would fall squarely within that provision, though it is undisputed that it was not mentioned at the conference when these provisions were agreed upon.

C.A. § 159(a), preserves the right of individual employees or groups of employees generally to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative,[10] that right has application only "as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect."[11] Considering the circumstances of this case, we think that the conduct of the twelve coremakers, and the resulting strike, did not properly constitute protected activity under the Act, and that respondent was justified in refusing reinstatement to the employees involved. See N. L. R. B. v. Draper Corporation, 4 Cir., 145 F.2d 199, 202–203, 156 A.L.R. 989; N. L. R. B. v. Condenser Corp., supra; cf. Gullett Gin Co., Inc., v. N. L. R. B., 5 Cir., 179 F.2d 499; Olin Industries, Inc., v. N. L. R. B., 5 Cir., 191 F.2d 613, certiorari denied, 343 U.S. 919, 72 S.Ct. 676, 96 L.Ed. 1332.

Finally, the Trial Examiner and the Board found that respondent had unlawfully solicited certain of its employees to return to work during the strike (see footnote 6, supra), and was thereby guilty of independent violations of Section 8(a)(1) of the Act, 29 U.S.C.A. § 158(a) (1). In reaching that conclusion the Trial Examiner considered such incidents "cumulatively against the background of the Respondent's other conduct". However, no anti-union animus on the part of respondent was shown, and the observations of the foremen involved appear temperate and more or less innocuous. As isolated and remote incidents set apart from the main controversy in the case, they do not fairly support the finding of unlawful interference and restraint, but were rather normal friendly communications between foremen and employees. The order of the Board in this regard must also be denied enforcement, as not supported by substantial evidence "on the record considered as a whole". Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 463, 95 L.Ed. 456.

The petition for enforcement of the order of the Board is denied in its entirety.

Petition denied.

---

10. See Hughes Tool Company v. N. L. R. B., 5 Cir., 147 F.2d 69, 72–73, 158 A.L. R. 1165; N. L. R. B. v. Draper Corp., 4 Cir., 145 F.2d 199, 203; Cf. Douds v. Local 1250, etc., 2 Cir., 173 F.2d 764, 9 A.L.R.2d 685.

11. The attempted grievance adjustment here was inconsistent with the safety provisions referred to in footnote 4 supra, and Superintendent Lott's agreement with Metker, with Robinson's approval, to look into the matter and "let Metker know" his reaction. For legislative history relating to proviso of this Section see U. S. Code Cong. Ser., 80th Congress, First Session (1947), p. 1152; 93 Cong. Rec. 3624–3625 (1947); see also Vol. LXI Harvard Law Review No. 2 (1947), p. 299.