The judgment of the district court will be affirmed.

NATIONAL LABOR RELATIONS BOARD
v.
SUNSET MINERALS, Inc.
No. 13777.

United States Court of Appeals
Ninth Circuit.
March 8, 1954.

George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, Elizabeth W. Weston, Abraham Siegel, Attorneys, N. L. R. B., Washington, D. C., for petitioner.

Wright, Booth & Beresford, Seattle, Wash., H. J. Hull & Sons, Wallace, Idaho, for respondents.

Before DENMAN, Chief Judge, and STEPHENS and POPE, Circuit Judges.

DENMAN, Chief Judge.

The National Labor Relations Board (hereafter the Board) petitions for the enforcement of an order requiring Sunset Minerals, Inc. (hereafter Respondent) to reinstate with back pay two of its employees,[1] the Board having held their discharge to be an unfair labor practice because its purpose was to punish them for engaging in a strike to compel the respondent to cure certain grievances presented to respondent by

1. Ronald E. Utz and Newberry Carroll. Three other men whom the Board found to have been wrongfully discharged have been reinstated by the respondent without having suffered any loss of pay.

In addition to ordering reinstatement of the two employees, the Board issued the usual cease and desist order and required the posting of the customary notices.

the discharged men's union, Local 18 of the International Union of Mine, Mill & Smelter Workers (hereafter the Union).

Respondent has attacked the findings of the Board as not being supported by the evidence. The uncontradicted facts are that the Union was the certified bargaining representative of the respondent's employees; that the labor contract between the Union and the respondent contained a provision that "the Union shall have the right to maintain a Grievance Committee" which had not been acted upon for several years; that on May 31, 1951, respondent received from the Union a list of 16 grievances concerning working conditions; that several of the grievances were corrected the following few days; that on June 4, 1951, twenty men out of a crew of forty-four did not report for work; that the Union did not order or authorize a strike and that the action of its members, if considered a strike, was what is commonly called a "wildcat" strike; that of these twenty men, three were on vacation, one was sick, and eleven had asked for and received permission to be off work; that of the remaining men, three replied that they had "gone fishing" and two gave no reason when asked why they had been absent; that these five men had been discharged, purportedly for not reporting for work and for not having received permission to be absent; that a company rule provided for the discharge of employees who failed to report for work without first having received permission; and that a strike resulted from these discharges which was settled by the reinstatement of three of the five men.

The findings which are disputed by respondent are that the June 4 walkout was a protest over working conditions and that the five men were discharged because they had participated in this concerted activity.

The record contains evidence tending to show that during the month of May, 1951, a number of complaints relating to working conditions in respondent's mines had been made by the employees; that no overt moves to correct these grievances were made until after the Union had written a letter concerning them which the respondent received on May 31, 1951; that respondent thereupon took immediate steps to correct the worst of the defects, including the use of special crews at overtime pay on Sunday, June 3. The grievances which were not immediately corrected necessitated the purchase of materials from distant points and, in some cases, the hiring of specialized labor.

On Monday, June 4, 1951, the alleged walkout took place. On their return, the men told respondent's shift boss, a supervisory employee with the power to hire and fire, that they had "gone fishing." [2] (It should be noted that June 4, 1951, was the opening day of fishing season in the area.) The Board found that respondent had discharged the two men because they had engaged in a protected concerted activity—a walkout over grievances.

The evidence as a whole reveals that although the respondent was taking prompt action upon the grievances of the men, they walked off the job. Upon their return the men did not claim that they had walked out because of the grievances, but to the contrary stated that they had gone fishing. In these circumstances we do not see how the employer can

---

2. Employee Ronald E. Utz testified as follows:

"Q. What reason did he give for discharging you? A. He asked me where I was on the previous day, and I gave him as my reason, fishing; and he said, 'Your check is in the office. Take the rest of the summer off to catch up.'"

Employee Newberry Carroll testified as follows:

"He just came in, and he said, 'You come in the office.'

"And that is all that he said; and I went in to the office.

"So I went in there, and they asked me the reason I laid off.

"I told them, I said, 'Well, haven't I got a right to lay off once in a while?' I said, 'I have been working seven days a week. I haven't had any days off, and I went up fishing.'"

be said to have discharged men for engaging in a protected concerted activity when they had no knowledge that such an activity was occurring.[3]

 In many respects this case parallels that of N. L. R. B. v. Draper Corporation, 4 Cir., 145 F.2d 199 at page 205, 156 A.L.R. 989, where the court stated: "It should be noted that a 'wild cat' strike in violation of the purposes of the act and of an agreement existing between the employer and employees for orderly collective bargaining is clearly distinguishable from a strike which, although not justified, nevertheless accords with the rights of the parties under the National Labor Relations Act. * * * [M]inorities who engage in 'wild cat' strikes, in violation of rights established by the collective bargaining statute, can find nothing in that statute which protects them from discharge."

Even if the walkout in this case had been a strike, it was a strike in violation of the grievance and safety procedures [4] laid down in the contract between the Union and the respondent and hence was not a protected activity. See N. L. R. B. v. American Mfg. Co. of Texas, 5 Cir., 203 F.2d 212, 216–217, and cases cited.

We recognize the power of the Board to draw "reasonable inferences" from the evidential facts found at the hearing, see Radio Officers' Union v. N. L. R. B., 347 U.S. 17, 74 S.Ct. 323, but we hold that the inferences drawn by the Board in this case were not reasonable. We deny enforcement to the Board's order because we "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456.

The Board's petition for enforcement of its order is ordered denied.

---

3. It is true that there is some evidence that management personnel of the respondent had some knowledge that a walkout might occur on June 4, but all of their testimony in this regard reveals that they contemplated a district-wide walkout such as is frequently resorted to by the Union as a method of showing its power, and not a local walkout by some of the men in its mine to protest the failure to correct the grievance.

4. The contract provides for a detailed grievance procedure, starting with a complaint by the employee or a member of the Union's grievance committee and the employee's immediate superior, through Company channels up to the highest Company officer at the mine, and finally submission to an arbitration board consisting of a member appointed by the Company, one appointed by the Union, and one appointed by these two.

In addition, the contract calls for a Safety Committee composed of three employee and three company representatives. This committee is required to hold bi-weekly meetings and to make suggestions to the Company as to safety conditions. In the event that the suggestions of the committee are not carried out by the Company, the Union may have recourse to the grievance procedure.