NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

UNIVERSAL SERVICES, INC. AND
ASSOCIATES, Respondent.

No. 71-1252.

United States Court of Appeals,
Ninth Circuit.

Oct. 10, 1972.

Donald W. Savelson (argued), Leonard M. Wagman, Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Peter G. Nash, Gen. Counsel, NLRB, Washington, D. C., Charles M. Henderson, Director, Region 19, NLRB, Seattle, Wash., for petitioner.

Dustin C. McCreary (argued), of Bogle, Gates, Dorin, Wakefield & Long, Seattle, Wash., for respondent.

J. Duane Vance, of Vance, Davies & Roberts, Seattle, Wash., for amicus curiae.

Before CHAMBERS and WRIGHT, Circuit Judges, and LUCAS,* District Judge.

LUCAS, District Judge.

The National Labor Relations Board seeks enforcement of its order which is based upon the finding that Universal Services, Inc. and Associates has violated the National Labor Relations Act, as amended. The charge directed against Universal states that it discharged five of its employees "for their having engaged in concerted activities, and/or their engaging in union activities . . . " and that it "at all times subsequent to [the date of discharge] has refused to reinstate said employees." The Board's decision is reported at 184 N.L.R.B. 42.

The Board found that Universal violated section 8(a)(1), 29 U.S.C. § 158(a)(1), which makes it an unfair labor practice to interfere with, restrain or coerce employees in the exercise of

* Honorable Malcolm M. Lucas, United States District Judge, Central District of California, sitting by designation.

their rights guaranteed under section 7, 29 U.S.C. § 157. That section guarantees to employees "the right . . . to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . " The trial examiner found that the activity engaged in by the five employees was protected concerted activity not prohibited by the provisions of the particular agreement in question. Specifically, he found that neither the local nor the individual employees agreed to be bound by the provisions of the agreement relating to grievance procedures, or the deprivation of the right to strike. The Board agreed with the trial examiner's ultimate conclusions that the local and the employees were not bound by the contract, but for different reasons. The Board reasoned that no "clearly definable contract" existed between the respondent and the local at the time of the incident, consequently, the men could not have been bound by any provision restricting their right to strike. We disagree with the reasoning and findings of both the trial examiner and the Board, and find an enforceable contract governed the rights and duties of the parties to the labor dispute.

## I.

The geographical location of the dispute in this case is of particular significance. The labor incident occurred during construction work performed for the Federal government preparatory to nuclear testing by the Atomic Energy Commission on the island of Amchitka, located approximately fourteen hundred miles southwest of Anchorage, Alaska at the end of the Aleutian Island chain. As its location suggests, this is a desolate, unpopulated place with only government authorized personnel residing thereon. *See* discussion *infra*.

Prior to 1966, Universal had furnished support services, including maintenance and operation work, under a contract with the United States Army Corps of Engineers.[1] On November 30, 1966, Universal executed a collective bargaining agreement with Local 302, International Union of Operating Engineers, effective from July 1, 1966, to June 30, 1969. Under this agreement, Local 302 was recognized as the exclusive bargaining agent for all maintenance and operational employees of Universal involved in the White Alice project. This contract contained express provisions outlining grievance procedures, and prohibiting the right to strike.[2] In late 1966, three employees from the White Alice project were assigned to the Corps of Engineers on Amchitka. These men participated in the maintenance and operation work being performed on that island for the Commission.

On February 15, 1967, Universal and Local 302 executed a "Supplement" to the basic agreement extending the coverage of the latter to the operations on Amchitka. This supplement set forth five "clarifications," but "[a]ll other terms and conditions [were to] remain the same."[3] Subsequently, the two parties executed a cryptic, one-page memorandum agreement simply entitled "1968," which was to reflect the "wages, hours and conditions" of employment on

---

1. Respondent is a joint venture comprised of Universal Services along with B-E-C-K Constructors, and Raber Kief, Inc. The joint venture shall be referred to as Universal. The Corps of Engineers contract covered work on the "White Alice Communications System," an air defense network on the Alaskan perimeter.

2. The 1966 contract shall be referred to as the basic agreement. Under Article XV, the parties pledged their "full cooperation" in implementing a detailed grievance procedure for the settlement of disputes. Under Article VII, the parties recognized the "vital importance" of the White Alice system to the nation's defense, and agreed to prohibit strikes and lockouts.

3. The clarifications dealt with new worker classifications and wage rates. The "Supplement" also provided for transportation to Amchitka from Anchorage or Seattle, and created a new operation location known as the "Amchitka Area."

the island. This document's fourteen paragraphs established a "Basic Day," a "Basic Work Week," travel time on the island, overtime, designation of paydays and holidays, vacations, sick leave, food and lodging, termination of employment, and wage, pension, and health and welfare rates. No reference was made to the prior documents, nor to grievance procedures and work continuity.

In March, 1967, Universal was contacted by an official from Local 341, Construction and General Laborers' Union, about supplying laborers for the Amchitka project. Universal notified Local 302 and arranged for negotiations. Subsequent conferences resulted in an oral agreement between the three principals that Local 341 would supply some laborers under the existing contract.[4] During the first half of 1968, Local 341 members were formally dispatched through Local 302, however, in the latter half due to a "terrific build up of personnel on the island," laborers were dispatched directly from Local 341 to "expedite matters." The five employees involved in the dispute were part of this rapid influx of laborers from the mainland.

After their arrival, friction developed between a group of laborers and their foreman, St. Pierre. The men learned that there was a union project steward working for another contractor at a different location on the island, but they were unable to contact him as to their differences with St. Pierre. In any event, St. Pierre refused to accept that steward's jurisdiction over the men's grievances, and told them to elect their own steward. The steward elected, one Julsen, attempted to secure a copy of the union agreement from the project manager, however, the project manager did not have access to a copy at that time. The men held a meeting and submitted a list of their grievances to St. Pierre. The unresolved tension between St. Pierre and the men increased. Particular testimony indicated that the foreman probably aggravated these conditions by inconsiderate supervision and racial epithets directed toward one of the men. This was the setting for the series of events which incited the work stoppage.

On December 22, 1968, the men were assigned to unload a barge. While awaiting the arrival of the barge, all of the men, including the foreman, spent several hours either relaxing or dozing in the warmth of a shed, except for brief moments when some of them would step outside for fresh air. The barge arrived and the men unloaded. The following day St. Pierre brought the elected steward, Julsen, and a Negro, Blount, before the acting project manager, Anderson, and informed the latter that the two men were fired for sleeping on the job. The men reported this action to their colleagues. On December 24th, the men gathered to discuss the two discharges and the grievances they wished to present to Anderson.

The taped record of the presentation of grievances to Anderson on December 25th indicates that a substantial personality conflict in fact existed between St. Pierre and the men, and that both had made some attempt to ameliorate differences. In the end, they were unable to arrive at an understanding, and Anderson chose to stand by his foreman. After the meeting, only St. Pierre, and another laborer, Smith, returned to work. The record is uncertain as to whether the respondent observed Christmas Day

4. At the regular meeting on April 10, 1967, Local 341 casually announced an arrangement to dispatch laborers through Local 302 as utility workers. Local 341 officials apparently assumed that their men would understand that their wages, hours and working conditions would be governed by the Local 302 contract. Officials of the two unions communicated from time to time with respect to the Local 341 men sent to the island. The conduct of the unions' leadership, including the notification of the Local 341 men sent to the island, supports the premise that the union viewed the Amchitka job as one governed by the Local 302 contract, notwithstanding the uncertainty and confusion of the leadership on the island.

as a legal holiday. The next day Anderson proposed to a group of the men that if they returned to work he would drop the matter. Three of the five employees eventually discharged were not present. The other two eventual dischargees present decided to reject this compromise. That evening the five met and decided to picket the barge unloading on the following day, December 27, 1968. They prepared placards stating, "This management is unfair to us." The workers, including the teamsters and engineers, refused to cross the line, and the barge unloading came to a halt.

Toward mid-morning, St. Pierre, Perez, selected as the spokesman, and Fleischman, another picketer, went to Anderson's office, where Local 341 was contacted by radiotelephone. McFarland, a union official, told Perez that Julsen and Blount had arrived in Anchorage, and had implemented the grievance machinery; that there was a strong likelihood that the procedure would result in achieving their . demands; that he was sending representatives from the two locals to the island; and that their work stoppage and picketing were against the rules. After informing the other strikers, Perez relayed back in a second message their rejection of the union's warning. At that point, McFarland ordered the men to cease their strike and to return to work. The men disobeyed and continued their picketing. During this second radiotelephone conference, a Local 302 agent, present in Local 341's office, had instructed the engineers' foreman to cross the line and unload the barge. Once the engineers began unloading, the other workers also crossed the lines. The five men then ceased their picketing.

The next day the five men, Perez, Fleischman, Moir, Neufeld and Weser were terminated. In mid-January 1969, Blount and Julsen were reinstated on Amchitka, and St. Pierre was discharged by Universal. The five strikers never made application for reinstatement.

## II.

This court is obligated to uphold the Board's conclusions as to the unenforceability of the agreement between Universal and Local 341 if such is supported by substantial evidence on the record considered as a whole. Thus, a threshold issue concerns the three documents purportedly governing the agreement between Universal and Local 341 in dispatching laborers to Amchitka. Petitioner's assertion that this court may not displace the Board's choice between two fairly conflicting views is accurate, however, congressional intent is clear that a

> reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); N. L. R. B. v. Walton Manufacturing Company, 369 U.S. 404, 405, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962); *see* Electromec Design and Development Company v. N. L. R. B., 409 F. 2d 631, 633 (9th Cir., 1969).

In view of the total record, we cannot "conscientiously find" that the three principals in this dispute failed to create an enforceable contract regulating labor relations on the island of Amchitka.

The principal questions presented for review were: (1) whether the Local 341 men dispatched to Amchitka, either directly or through Local 302, were assigned under the collective bargaining agreement between Universal and Local 302, thereby precluding them from engaging in any strike or work stoppage, and requiring them to submit labor disputes through a formal grievance procedure; and (2) whether, even if there was an enforceable contract between Universal and Local 341, the five men had engaged in protected concerted ac-

tivities by protesting their working conditions. Respondent also raised the propriety of the Board's decision in requiring Universal to remunerate the strikers for unperformed work; in designating the reinstatement date as of January 14, 1969; and in issuing a broad cease and desist order under section 8(a)(1) of the Act. Inasmuch as this court finds that the assignment of Local 341 men to Universal on Amchitka was governed by the Universal-Local 302 contract, the second principal issue is not reached, and the remaining questions pertaining to the Board's order are rendered moot.

■ The dispositive contractual issue in this case can be reduced to two questions: (1) whether the work continuity and grievance procedure provisions set forth in the basic agreement extended to the Amchitka project; and (2) whether, if so extended, they governed the actions of the Local 341 laborers dispatched to the island.

### III.

The trial examiner concluded that Universal failed to attain a "representative complement" of laborers on Amchitka at the time the basic agreement was extended to cover those employees on the island, and that, as a result, such extension was premature recognition of that work force as a bargaining unit. Thus, this would preclude an effective adoption or ratification of the Local 302 contract by Local 341. And the failure to produce a copy of the contract at the

site for the Local 341 laborers was emphasized in the finding that they were not individually bound to the work continuity and grievance procedure provisions.

■■ This analysis is based, at best, on evidence of differing interpretation,[5] and tends to subordinate fundamental premises of the Act. The extension of a labor unit to Amchitka was not accomplished over a period of months in an ordinary urban setting, but rather during a rapid build up of labor along a primitive perimeter, and in spite of governmental security clearances and transoceanic distances. Such made comprehensive transmission of information, and formal negotiations between contractors and unions not only difficult, but perhaps even undesirable. Access to labor hall assignments, chartered aircraft services, and most crucially, methods of communication was limited. Consequently, customary formalities were bypassed, and the principals arrived at informal oral accommodations. Considering this background,[6] the eventual twelve or thirteen man contingent from Local 341 was a sufficient complement at the time of the dispute for the purposes of recognizing the application of the basic agreement's provisions in question.[7]

■ The emphasis on the absence of express individual assent to the work continuity and grievance procedure provisions misplaces priorities. The union

5. The courts, along with arbitrators when so provided for by the parties, are still the principal sources of contract interpretation. N.L.R.B. v. Strong, 393 U.S. 357, 360–361, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969); United Steelworkers v. Enterprise Wheel and Car Corp., 363 U.S. 593, 598–599, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

6. In governing the interpretation and enforcement of collective bargaining agreements "special heed should be given to the context in which collective bargaining agreements are negotiated and the purpose which they are intended to serve." United Steelworkers v. American Manufacturing Co., 363 U.S. 564, 567, 80 S.Ct.

1343, 1346, 4 L.Ed.2d 1403 (1960). See Lewis v. Benedict Coal Corp., 361 U.S. 459, 467–470, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960).

7. In view of the irregular circumstances under which the Local 302 men initially, and the Local 341 men subsequently were dispatched to the island, and the nature of the project itself, an unqualified application of the Board's unit recognition rule would appear to be somewhat inappropriate. Cf. N.L.R.B. v. Guy F. Atkinson Co., 195 F.2d 141, 144 (9th Cir., 1952); N.L.R.B. v. Cen-Vi-Ro Pipe Corporation, 457 F.2d 775, 777 (9th Cir., 1972).

leadership omitted formal submission of the agreement to the rank and file in favor of expediency and flexibility. The agreement, apparently finalized in Seattle, provided that Local 341 would supplement Local 302 as a source of utility labor for the rapid build up on Amchitka, and that certain provisions in the basic agreement would establish the fundamental rights and duties, including understandings pertaining to work continuity and grievances. Matters pertaining to primarily internal concerns—pensions, health, and welfare policies, hiring hall procedure and union security—were excepted. The memorandum agreement, in conjunction with the two prior documents, mirrors this casual, yet practical adoption by the principals of the customary obligations, while allowing for variations with respect to those specifics usually regarded as internal interests. This arrangement may be viewed as an attempt to prevent, not create, the conditions for a jurisdictional dispute. To consider invalid this informal agreement for failure to submit its details to a formal rank and file vote would be to elevate form over substance, and the individual over the collective. Both would be contrary to the purposes of the Act. The implication that individual laborers could not be bound by informal oral agreements concluded by their authorized bargaining representatives within the scope of their duties unless they individually assented to a formal memorial is not only unpersuasive as a general proposition, but contrary to the principles which have evolved from this particular body of law.[8] To require individual express assent to such critical questions as work continuity and grievance procedures would be to curb, perhaps fatally, the authority of those collective bargaining representatives who seek to serve the labor unit, and upon which the bargaining strength of trade unions lies. Requiring individual assent would ultimately divide the rank and file, and destabilize industrial relations. This outcome is clearly contrary to the purposes of the Act. Humphrey v. Moore, 375 U.S. 335, 349–350, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Ford Motor Company v. Huffman, 345 U.S. 330, 339, 73 S.Ct. 681, 97 L.Ed. 1048 (1953).

The conduct of the leadership, and of the men, supports the conclusion that they felt obligated to implement grievance procedures and to refrain from spontaneous work stoppages. Such a practical interpretation placed upon an agreement by the parties is often of dispositive importance in determining their intent and the purposes of the obligation.[9]

IV.

At this juncture, the Board favored the individual measures taken by the five men. Relying upon N. L. R. B. v. Washington Aluminum Co., 370 U.S. 9, 14, 82 S.Ct. 1099, 1103, 8 L.Ed.2d 298 (1962) it suggests that "they had to speak for themselves as best they could." In that case, the seven employees ultimately reinstated were "wholly unorganized," with no bargaining representative of any kind, such that the "direct course" of action taken by them was justifiable under the circumstances. 370 U.S. at 14–15, 82 S.Ct. 1099. The facts and issues of law are somewhat different in this case. In *Washington Aluminum,* there was evidence that even the employer supported the measures taken by the men; their foreman expressed the opinion that the men should go home because of the cold working conditions. 370 U.S. at 16, 82 S.Ct. 1099. Furthermore, the key issue of union solidarity and cohesiveness was not present in that case. In the instant case, representatives were ready and willing to speak for the men, and they informed the men "as best they could" that the grievances raised were being dealt with, and were optimistically appraised by the union.

8. *Cf. Cen-Vi-Ro, supra* at note 7.

9. *See* 17 Am.Jur.2d Contracts § 274 (1964); 3 Corbin, Contracts § 558 (1960).

*Cf. Electromec Design, supra* 409 F.2d at 634.

Any doubt that the men had at this critical point should have been resolved in favor of the union leadership. In holding that an arbitration clause covered a particular dispute, the Supreme Court rejected static formalism in interpreting and applying collective bargaining agreements, and noted that "grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government," that the meaning and content of grievance procedures evolve from the collective bargaining system which is based upon a continuous, flexible process, not a fixed, rigidly-defined relationship bound by formalities. United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *see* Local 174, Teamsters Union v. Lucas Flour Company, 369 U.S. 95, 104–105, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); Textile Workers Union v. Lincoln Mills of Alabama, 353 U.S. 448, 454–456, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

■ The men were obligated to allow their bargaining representative to speak first on their behalf, and to restrain individual initiative. In N. L. R. B. v. Tanner Motor Livery, Ltd., 419 F.2d 216, 221 (9th Cir., 1969) this court recognized the trend to insure utilization of internal remedies as opposed to sanctioning individual efforts, the result of which strengthens the union vis-a-vis the employer, modulates the collective bargaining process, and yet influences the union majority so that long range effective action can be taken to implement the interests of the dissenting minority. *See* N. L. R. B. v. Shop Rite Foods, Inc., 430 F.2d 786, 791 (5th Cir., 1970). In the instant case, although

perhaps the men did go to greater lengths in approaching their representatives than in *Tanner,* their obligation to the union requires them not only to approach their leaders, but to allow the internal remedies thus implemented to run their course before preempting the union's bargaining, or, as in this case, negotiating position. This premise stands notwithstanding the inclusion of variables which expand the time frame required for results.[10]

■ This court is not prepared to hold that, in spite of the work continuity provision, the work stoppage was justified under the rationale expressed in Mastro Plastics Corp. v. N. L. R. B., 350 U.S. 270, 286–287, 76 S.Ct. 349, 100 L. Ed. 309 (1956). Notwithstanding the ambiguities present in this record, it is conclusively clear that the severe circumstances justifying the work stoppage in *Mastro Plastics,* in direct contravention of the no-strike clause, did not exist in this case. In fact, the record reveals good faith efforts by both the bargaining representatives and the supervisory personnel to reach an immediate and mutual accord on the matters in dispute. With the possible exception of St. Pierre, the only wilful disruptive action taken was the continuation of the unauthorized "wildcat" strike by the five men in direct disobedience to their lawful representatives. The rest sought conciliation and accommodation.

■ The Board adopted the conclusions as to the absence of a binding obligation against the strikers basing its reasoning not on the impropriety of internal union ratification, but on the form of the documents themselves. The Board concluded that a "clearly definable contract" did not exist between Local 341 and respondent. In arriving at this conclusion, the Board found that the memo-

---

10. In N.L.R.B. v. Sunset Minerals, 211 F.2d 224, 225 (9th Cir., 1954) this court noted, in a case closely analogous to this case, that a walkout violated grievance procedures inasmuch as the employer had taken "immediate steps" to remedy the defects, and grievances which were not immediately corrected necessitated, in part, the delivery of materials from distant locations. *See* N.L.R.B. v. Draper Corp., 145 F.2d 199, 205 (4th Cir., 1944); N.L.R.B. v. American Manufacturing Co., 203 F.2d 212, 216–217 (5th Cir., 1953).

randum agreement spoke for itself as a "self-contained" contract, yet, in the same breath, it conceded that some of the provisions could not stand alone. The analysis that this document can stand alone is unreasonable in light of the obvious interrelationship of the three documents, and, more crucially, in view of the interpretative conduct of the principals and their men.[11] Specifically, the provisions contained in the memorandum agreement appear to derive their obligatory nature entirely from a conjunctive reading of that document with the basic agreement and the supplement. It is simply unreasonable to conclude that this one-page agreement was other than an amplification and modification of the two preceding documents, especially in light of the unilaterally oriented provisions pertaining to internal union matters. The more reasonable inference is that the two unions viewed the three documents as establishing the basic directive which supplied the requisite standard provisions governing work on a classified government project, yet modified by an informal oral agreement that would allow both labor organizations to retain full institutional authority in those areas peculiar to their own jurisdiction.

The hiring hall procedures epitomized the informality of the arrangement, and underscored the expediency of the labor supply operation. The conclusion that the inconsistent dispatching of men from both halls was tantamount to non-recognition by Local 341 of the basic work provisions is again elevating form over substance, and disregarding the practical solutions arrived at by the principals. Finally, it is rather unreasonable to assume that Universal would consider as a satisfactory arrangement the adoption of the memorandum agreement as the summary statement governing Local 341 personnel on the island, particularly in view of the work continuity, grievance procedure, and availability of personnel provisions previously negotiated in the basic agreement.[12] This seems particularly unlikely in view of the tight schedule for completion of the job in preparation for the atomic tests, and in light of the possible penalties for completion delays. Given these considerations, the more reasonable inference that emerges is that the informal memorandum agreement merely supplemented the prior agreements, and did not stand alone as the definitive document governing working conditions on Amchitka.

## V.

In conclusion, the practical expediency by which the parties solved the problem of labor supply, the communication and logistic difficulties involved between Anchorage, Amchitka and Seattle, and the consequences of working on a security-oriented government project necessitated informal disposition of labor matters which ordinarily would have been the subject of more formal, and informative, negotiations and agreements. The position of the individual laborer here is not wholly lacking in merit. But, in a case of this nature, the encouragement of such an advantage to be taken by the individual laborer would be to create greater, and more far-reaching, disadvantages for the bargaining representative, and, as such would be excessively disruptive in industrial relations. The freedom of action withheld from the individual laborer in a case of this nature is more than compensated by a resultant strengthening of the negotiating position of the collective whole. And, upon the strength of the group vis-a-vis the employer rests the ultimate security of

11. *See* note 9, and discussion, *supra*.

12. *See* note 2, *supra*. Article XI, § 5 of the basic agreement recognized the twenty-four hour per day operational nature of the national defense mission of the White Alice system, and provided that "all Employees must necessarily be available for work at all times and, if required by emergency circumstances, shall work whatever hours may be necessary, in the judgment of the Company, for effective operation . . . ." The nature of the operations on Amchitka did not differ substantially from the purposes of the White Alice project.

the individual worker. *See* Scofield v. N. L. R. B., 394 U.S. 423, 435–436, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969); N. L. R. B. v. Allis-Chalmers Manufacturing Co., 388 U.S. 175, 180, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967); Tanner, *supra*, 419 F.2d at 220–221.

The Local 341 laborers dispatched to Amchitka were bound by the work continuity and grievance procedure provisions of the basic agreement. Consequently, their work stoppage was unprotected concerted activity. Their subsequent discharge and removal from the island was a necessary and appropriate response by the employer.

The Board's petition for enforcement of its order is denied.