**FOOD FAIR STORES, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 73–1309.

United States Court of Appeals, Third Circuit.

Argued Nov. 5, 1973.

Decided Jan. 18, 1974.

---

1. The parties shall bear the costs which each, respectively, has incurred in connection with this appeal.

Joseph Bell, John B. Nason, III, Kleinbard, Bell & Brecker, Philadelphia, Pa., for petitioner.

Robert G. Sewell & Margery E. Lieber, Attys., NLRB; Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, and Elliott Moore, Asst. Gen. Counsel, NLRB, for respondent.

M. Kalman Gitomer, Peter M. Stern, Kenneth F. Kahn, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., for amicus curiae, Food Employer's Labor Relations, Inc.

Before VAN DUSEN, HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This case is before the court upon the petition of Food Fair Stores, Inc. (hereinafter the "Company") to review and set aside an order of the National Labor Relations Board issued against the Company on March 12, 1973, and reported at 202 N.L.R.B. No. 51. The Board has filed a cross-application for enforcement of its order. This court has jurisdiction of the proceeding under section 10(e) and (f) of the National Labor Relations Act (hereinafter the "Act"), as amended, 29 U.S.C. § 151 et seq., since the alleged unfair labor practices occurred in Philadelphia where the Company has a food distribution center from which it supplies retail stores in Pennsylvania and southern New Jersey.

In the course of its business, the Company employs some 200 full-time truck drivers and some 20 to 30 "casual" truck drivers. The casual drivers are those called on to replace a regular driver who is absent or on vacation. The Company's truck drivers, casual as well as regular, are represented by Food Drivers, Helpers and Warehousemen Employees Local 500, IBT (hereinafter the "Union"). The Company and the Union are parties to a collective bargaining agreement between Food Employer's Labor Relations, Inc., amicus curiae here, representing 18 employers in the food distribution and processing industry, including Food Fair, and four local unions, including Local 500. The agreement is in effect from January 1, 1971, through December 31, 1973, and covers both casual and regular drivers. The provisions relevant to the case are reproduced in the footnote below,[1] which includes the

1. "ARTICLE 8
Grievance and Arbitration Procedure
Section 1.
 Grievances involving disputes concerning the application or interpretation of the express terms of this Agreement shall be handled in the manner provided for by this Article.
 * * * * *
Section 7.
 The decision of the arbitrator shall be final and binding upon all parties. Failure to comply with arbitrator's award within ten (10) days after receipt thereof shall permit either party legal and/or economic recourse.

 * * * * *
Section 9.
 It is further mutually agreed that the Local Union will within two (2) weeks of the date of the signing of this Agreement serve upon the Employer a written notice, which notice will list the Union's authorized representatives having the sole authority to act for the Union in calling or instituting strikes or any stoppage of work which are not in violation of this Agreement and the Union shall not be liable for any activities unless so authorized. It is further agreed that in all cases of an unauthorized strike, slowdown, walk out or any unauthorized cessa-

prohibition against work stoppages in Article 28.

The casual drivers subsequently became dissatisfied with a number of Company practices, and on November 6, 1971, between 14 and 18 of the casual drivers met to review them. Uppermost among these grievances was their frustration in achieving permanent status as truck drivers.[2] The next day, the casuals presented their problems to Union shop steward Emberger, who agreed to arrange a meeting with Union officials.

On November 16 the casuals met with Emberger, Union Secretary-Treasurer William Brown, and Union Vice-President William O'Farrell. After hearing their grievances, Brown told the drivers there was nothing the Union could do for them. When the men insisted that an effort be made to arrange a meeting with the Company, O'Farrell consented and tried, unsuccessfully, to reach Robert McIntyre, the Company's Assistant Director of Industrial Relations. During this meeting, the casual drivers mentioned the possibility of a protest "demonstration."

After the meeting, Emberger, O'Farrell, and probably Brown remained to await a call from McIntyre. When McIntyre did not call, O'Farrell called

---

tion of work in violation of this Agreement, the Union shall not be liable for damages resulting from such unauthorized acts of its members. While the Union shall undertake every reasonable means to induce such employees to return to their jobs during any such period of unauthorized stoppage of work mentioned above, it is specifically understood and agreed that the Employer, during the first twenty-four (24) hour period of such unauthorized work stoppage, shall have the sole and complete right of reasonable discipline short of discharge and such union members shall not be entitled to or have any recourse to any other provisions of this Agreement. After the first twenty-four (24) hour period of such stoppage and if such stoppage continues, however, the Employer shall have the sole and complete right to immediately discharge any Union member participating in any unauthorized strike, slowdown, walk out, or any other cessation of work, and such Union member shall not be entitled to or have any recourse to any other provisions of this Agreement."

"ARTICLE 11
Discharge or Suspension
Section 1. Cause for Dismissal or Suspension

No employee may be dismissed or suspended without just cause, except for lack of business.

Nothing shall prohibit Union from investigating any dismissal or suspension and resorting to the grievance procedure provided in Article 8. Until the case has been discussed with the Business Agent, no employee may be dismissed or suspended except (a) where lack of business causes the dismissal or suspension, or (b) where the provisions of this Article provide for immediate discharge.

\* \* \* \* \*

The parties agree that causes for dismissal without first discussing the matter with the Business Agent, shall be the following.
1. Calling an unauthorized strike or walk-out."

"ARTICLE 28
Mutual Guarantees
Section 5.

All grievances shall be processed in orderly fashion through the steps provided in Article 8 of this Agreement. There shall be no threats by any Steward, Business Agent, Employer or his representative. There shall be no work stoppages or threats thereof except as specifically permitted under the provisions of Article 8."

2. Under the terms of the agreement, the casual drivers were unable to acquire seniority or permanent status. Although the Company had in the past granted permanent status to casual drivers with longer service, this practice had been stopped two years before. Further discontent stemmed from the claim of the casual drivers that they had been denied access to the contractual grievance procedure, having allegedly been advised by their union that they had no right to file grievances except with regard to "monetary" matters. Other complaints against the Company related to: (1) the requirement that the casuals sign employment forms which did not contain the name of the driver replaced and that they sign these forms in blank when working Saturdays (not a regular work day), thereby depriving them of the opportunity of acquiring eligibility for permanent status; (2) the denial of three days' work during a holiday week to the casual drivers, thus depriving them of holiday pay under the contract; (3) the dispatching of casuals without regard to their length of service; and (4) the denial of sufficient work to casuals in a quarterly period to qualify them for health and welfare benefits.

him again and requested a meeting. McIntyre suggested a meeting November 19.[3] O'Farrell told him that unless a meeting was arranged immediately, the casual drivers might demonstrate the following night. McIntyre replied that if they did, there would be no meeting until work recommenced. McIntyre also reminded O'Farrell that as Union officials, he and Brown had an obligation under the contract to make sure that there was no interruption in the Company's operations and told him that if he expected any problem in that regard it was incumbent on him personally to see that it was resolved. O'Farrell assured him that he would do everything possible to keep the men in line.

The following day, November 17, some of the casual drivers gathered at the home of one of their group to await an answer to their request for a meeting with the Company. When they did not receive a call, they telephoned the Union. They were told that the Company had not responded and apparently was not going to meet with the casual drivers. On hearing this, they began to prepare signs for a "demonstration."

Between 8:30 and 10:00 P.M. on the night of November 17, the casual drivers began picketing the entrances to the Company's distribution center. The pickets were peaceful and orderly and did not interfere with other workers entering or leaving the center. At about 10:00 P.M., Union representatives Emberger, Brown, and O'Farrell arrived. Brown, in the presence of Company representatives, told the pickets that their activity was not authorized or sanctioned by the Union and that they should disperse. The pickets, with ap-

parent sarcasm, thanked Brown and continued picketing until about 3:30 P.M. on November 18, when the pickets were served with a state court injunction. The walkout thus lasted approximately 18 hours. During this time, only one casual driver was available for work, and many regular drivers also failed to report for work.[3a]

On November 18 the Company terminated the 21 casual drivers who had participated in the walkout and thereafter refused to recall them. Following their discharge, the casual drivers attempted to have the Union file a grievance on their behalf, but the Union refused to do so. Thereafter the casual drivers filed a charge against the Union, alleging that it had denied them fair representation, but that charge was subsequently withdrawn.

The instant charge against the Company was filed on November 23, 1971, and a complaint was issued against the Company in June 1972. Following a hearing, the Decision, including Finding of Fact and Conclusions of Law, as well as a recommended Order, of the Administrative Law Judge was issued on November 17, 1972. On March 13, 1973, the Board affirmed the rulings, findings and conclusions of such judge and adopted his recommendations. In its decision the Board found that the protest walkout in this case was concerted activity protected by section 7 of the Act and that the right of the employees to engage in a walkout of less than 24 hours' duration had not been waived in the collective bargaining agreement. The Board held, therefore, that the Company had violated section 8(a)(1) of the Act by discriminating against the 21 casual

3. McIntyre testified that he was faced with a November 17 deadline for negotiations with another union, not involved in this proceeding, and that November 19 was the earliest day he could meet with the Union.

3a. The Administrative Law Judge found that these activities constituted a work stoppage (p. 9 of Administrative Law Judge's Decision). Furthermore, although under Article 11, Section 1, only the *calling* of an unau-

thorized strike constitutes cause for immediate discharge, the Administrative Law Judge also found that this language was intended to outlaw unauthorized strikes, not merely the calling of such strikes, and that in any event, since the casuals acted concertedly in their decision to "demonstrate," it may be said that they called the strike by common consent (p. 14 of Administrative Law Judge's Decision). Neither of these findings has been made an issue on appeal.

drivers who had participated in the walkout.[4]

There has been much discussion in this case as to whether under the terms of the collective bargaining agreement the Company has the right to discharge employees who engage in work stoppages of less than 24 hours' duration. The Company argues that Article 11, section 1, of the agreement provides for "immediate discharge" of any employee who participates in an unauthorized strike or walkout and that its right to apply this sanction is in no way abridged by Article 8, section 9. According to the testimony of Mr. McIntyre, the purpose of the disputed clause in Article 8, section 9, was not to forbid discharge during the first 24 hours of an unauthorized strike, but rather to create an exception for workers discharged during that period from the provision that workers disciplined for participation in a wildcat strike are not entitled to have recourse to the grievance procedures of the agreement. In support of this construction, the Company points out that the 24-hour clause appears in the article of the agreement dealing with the grievance procedure, rather than the one concerning discharge, and, furthermore, that Article 8, section 9, contains a provision absolving the Union of any possible liability for wildcat strikes, which the Company maintains was the quid pro quo for the 24-hour clause. However, the Board re-

jected this interpretation, since it found that the clear meaning of Article 8, section 9, on its face was to limit the employer's right of discipline during the first 24 hours of an unauthorized work stoppage to all reasonable measures short of discharge.

 It is unnecessary for this court to resolve this dispute, for whether the agreement is read to permit the discharge of strikers during the first 24 hours of an unauthorized work stoppage or not, the walkout in this case was not protected by section 7 of the Act and, therefore, the Company's discharge of the employees who participated in the walkout did not violate section 8(a)(1) of the Act.[5] Section 7 guarantees employees the right "to engage in other concerted activities for the purposes of collective bargaining or other mutual aid or protection." In defining the scope of concerted activities to be afforded the protection of the Act, courts have generally excluded two types of employee conduct, both involved here—unauthorized strikes and strikes in breach of a collective bargaining agreement.

The question of whether unauthorized strikes are "concerted activities" in which employees have a right to engage poses an important issue of policy. As this court observed in N.L.R.B. v. Rubber Rolls, Inc., 388 F.2d 71, 73 (3d Cir. 1967):

"The problem is a fundamental one, for it involves the sometimes incom-

4. The Board's order requires the Company to cease and desist from threatening to impose the penalty of discharge on employees for engaging in unauthorized work stoppages lasting less than 24 hours, and in any like manner interfering with, restraining or coercing employees in the exercise of section 7 rights. Affirmatively, it requires the Company to restore each of the casual employees to his former position, without prejudice to any of the rights and privileges enjoyed by them, to make them whole for any loss of earnings they may have suffered by reason of the Company's action, and to post the appropriate notices.

5. Of course, if the Board's interpretation of this provision is correct, then these discharges would violate the terms of the

agreement. However, the discharge of employees in violation of an agreement does not necessarily constitute a violation of section 8(a)(1), which makes it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7. If the activity for which employees are discharged is not protected by section 7, there can be no violation of section 8(a)(1). In that case, the employees' remedy for any breach of the agreement would be under either the terms of the agreement (see note 7, *infra*) —a procedure that makes use of the expertise of an arbitrator in interpreting the terms of the agreement (cf. Collyer Insulated Wire, 192 N.L.R.B. No. 150 (1971))—or section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.

patible policies of conferring on the collective bargaining agent selected by a majority of the employees the exclusive authority to speak for all of them and of permitting employees the right to individual expression over matters affecting their conditions of employment."

Nearly all of the circuits that have been confronted with this issue have followed the decision of the Fourth Circuit in N. L.R.B. v. Draper Corp., 145 F.2d 199 (4th Cir. 1944), and have treated unauthorized strikes as unprotected activity per se. See Plasti-Line, Inc. v. N.L.R. B., 278 F.2d 482 (6th Cir. 1960); N.L. R.B. v. Sunbeam Lighting Co., 318 F.2d 661 (7th Cir. 1963); Harnischfeger Corp. v. N.L.R.B., 207 F.2d 575 (7th Cir. 1953); N.L.R.B. v. Illinois Bell Telephone Co., 189 F.2d 124 (7th Cir.), cert. denied, 342 U.S. 885, 72 S.Ct. 173, 96 L. Ed. 663 (1951); N.L.R.B. v. Tanner Motor Livery, Ltd., 419 F.2d 216 (9th Cir. 1969); N.L.R.B. v. Sunset Minerals, Inc., 211 F.2d 224 (9th Cir. 1954). This approach is supported by recent Supreme Court decisions holding that because of the interest of section 9(a) of the Act in a union's status as exclusive bargaining agent, some of the section 7 rights of the employees may be exercised only in accordance with the majority choice of the union. See Scofield v. N.L.R.B., 394 U.S. 423, 89 S. Ct. 1154, 22 L.Ed.2d 385 (1969); N.L. R.B. v. Allis-Chalmers Mfg. Co., 388 U. S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967).

The principal exception to the general unwillingness of courts to grant the protection of the Act to unauthorized strikes was the decision in N.L.R.B. v.

R. C. Can Co., 328 F.2d 974 (5th Cir. 1964), where the Fifth Circuit distinguished between unauthorized activity which supported union objectives and that which opposed them, holding that the former was protected. In N.L.R.B. v. Rubber Rolls, Inc., *supra* at 73 of 388 F.2d we expressed in dicta our approval of the *R. C. Can* decision, noting that in some situations unauthorized activity by employees might enhance the authority of the union and aid the collective bargaining process. Since then, however, the Fifth Circuit has cast doubt on the continued viability of the approach taken in *R. C. Can* and has warned that its decision there should be read rather narrowly. N.L.R.B. v. Shop Rite Foods, Inc., 430 F.2d 786, 790–791 (5th Cir. 1970).[6]

The unauthorized walkout in this case was carried out against the wishes of the Union, which, in compliance with its contractual obligation under Article 8, section 9, sought to induce the casual drivers to return to their work. It violated the provision of Article 8, section 9, of the agreement which gives the Union sole authority to call any strikes not in violation of the agreement. And the purpose of the walkout was in part to protest against certain substantive portions of the agreement concerning seniority to which the Union had assented. Under these circumstances, it is clear that the activity of employees should not be granted the protection of the Act; otherwise, the status of the Union as exclusive bargaining agent would be weakened and the orderly resolution of industrial conflicts envisioned by the Act would be impaired. The employees had available to them a contractual grievance procedure,[7] and

---

6. "*R. C. Can* concerned a very narrow set of circumstances in which the minority action was directed toward a specific previously considered and articulated union objective. If union objectives are characterized in general terms—such as wages, job security, conditions of employment and the like—one can assume that in the great majority of instances minority action will be consistent with one or more of those objectives. If *R.*

*C. Can* is not applied with great care it would allow minority action in a broad range of situations and permit unrestrained undercutting of collective bargaining." N.L.R.B. v. Shop Rite Foods, Inc., *supra* at 790.

7. Article 8, section 1, states: "Grievances involving disputes concerning the application or interpretation of the express terms of this agreement shall be handled in the man

their proper course was to press their claims through it, rather than to engage in an unauthorized strike.[8]

■■■ In addition, the law is clear that strikes carried out in violation of a no-strike provision in a collective bargaining agreement are not protected by the Act, and therefore the discharge of employees who engage in such strikes is not an unfair labor practice. See Atkinson v. Sinclair Refining Co., 370 U.S. 238, 246, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); Mastro Plastics Corp. v. N.L. R.B., 350 U.S. 270, 280, 76 S.Ct. 349, 100 L.Ed. 309 (1956); N.L.R.B. v. Rockaway News Co., 345 U.S. 71, 80, 73 S.Ct. 519, 97 L.Ed. 832 (1953); N.L.R.B. v. Sands Mfg. Co., 306 U.S. 332, 344, 59 S. Ct. 508, 83 L.Ed. 682 (1939). Whether a particular collective bargaining agreement includes a waiver of the employees' right to strike, and the extent of any such waiver, "turns upon the proper interpretation of the particular contract . . . [which] must be read as a whole and in light of the law relating to it when made." Mastro Plastics Corp. v. N.L.R.B., *supra* at 279 of 350 U.S., at 356 of 76 S.Ct. Thus, we must look to the terms of the agreement in this case to determine if the walkout of the casual drivers violated any waiver of their right to strike contained therein.[9]

---

ner provided for by this Article." In addition, Article 11, section 1, provides: "Nothing shall prohibit Union from investigating any dismissal or suspension and resorting to the grievance procedure provided in Article 8." Furthermore, the Board specifically found as follows:

"The contention that casual drivers were denied access to the grievance procedure is not borne out by the record. The record fairly establishes that shop stewards have actually presented grievances, albeit orally and informally, with favorable results, without resorting to the grievance procedure. More importantly, at least one formal grievance, involving the very issue for which the casuals engaged in the work stoppage, was carried to the arbitration stage and settled, without the intervention of the arbitrator, by achieving what the casuals sought here, namely the assignment of casual drivers as permanent drivers on the seniority list." (P. 13 of Administrative Law Judge's Decision.)

8. We note that the Company representative, Mr. McIntyre, had offered to meet with the Union to discuss the casual drivers' grievances on November 19, on the condition that the casual drivers not stage a walkout. See p. 391 and note 3, *supra*. This offer apparently was never communicated to the casual drivers by the Union representatives. However, the Company cannot be held responsible for the lack of communications between the employees and their chosen bargaining agents and should not be made to suffer the consequences thereof.

9. In its brief, Food Employer's Labor Relations, Inc., amicus curiae, argues that since the question of whether there is a violation of the Act depends exclusively on an interpretation of the agreement, the Board should have followed its decision in Collyer Insulated Wire, 192 N.L.R.B. No. 150 (1970), and deferred to the decision of the arbitrator provided for in the grievance procedure of the agreement. The Board recognized in *Collyer* that contract interpretation is a function peculiarly within the expertise of an arbitrator and that deferral is appropriate where "it appears that the arbitral interpretation of the contract will resolve both the unfair labor practice issue and the contract interpretation issue in a manner compatible with the purposes of the Act." Subsequently the Board held that questions involving waiver of the right to strike, such as those presented here, may be appropriate for deferral. National Tea Co., 198 N.L.R. B. No. 62 (1972).

We do not think that these past applications of its deferral policy required the Board to defer to arbitration in this case. In *National Tea* the unfair labor practice charge was filed after grievances had been processed through to a neutral tribunal's award upholding the discharges. The Board's deferral there involved the application not of the *Collyer* doctrine but rather of the principles of *Spielberg Mfg. Co.*, 112 N.L.R.B. 1080 (1955), concerning deferral to an outstanding arbitral award. In this case the arbitration process was not even invoked, much less completed. Furthermore, the Board has indicated that it will not rule on deferral issues in the abstract; it requires that the party seeking deferral raise it as an affirmative defense, before the Administrative Law Judge, stating why deferral is appropriate for a particular case. See MacDonald Engineering Co., 202 N.L.R.B. No. 113, CCH Labor Law Rep. ¶ 25,192 at p. 32,459 (1973); Montgomery Ward & Co., 195 N.L.R.B. No. 136 at p. 725, n. 1 (1972). In its brief, the Board suggests two reasons

■ Article 28, section 5, provides that "[t]here shall be no work stoppages or threats thereof except as specifically permitted under the provisions of Article 8." The Company argues that the only work stoppage specifically permitted in Article 8 is that provided for in section 7 in cases where one of the parties to the agreement fails to comply with an arbitrator's award. However, the Board found that Article 8, section 9, also contained an exception to the no-strike clause of Article 28, section 5, for strikes of less than 24 hours' duration. The Board apparently reasoned that Article 8, section 9's prohibition against discharges during the first 24 hours of an unauthorized strike implied that work stoppages lasting less than 24 hours are permitted.[10] In support of this conclusion, the board relied on its decision in Wagoner Transportation Company, 177 N.L.R.B. 452, *enforced*, 424 F.2d 628 (6th Cir. 1970) (per curiam), a case involving a contractual provision nearly identical to the 24-hour clause here. Adopting the decision of the Trial Examiner, the Board held there "that to the extent that the Agreement prohibited the Respondent from exacting the extreme penalty of discharge on employee-participants in wildcat strikes of less than 24 hours' duration, such strikes are protected activities under the provisions of Section 7 of the Act which guarantees to employees the right to engage in 'concerted activities for the purpose of collective bargaining or other mutual aid or protection.' " *Id.* at 457.

We find this reasoning unpersuasive. Even assuming that the 24-hour clause prohibits the discharge of employees who participate in an unauthorized walkout lasting less than 24 hours, it does not follow, as a matter of sound construction or of logic, that such a walkout is thereby excepted from the no-strike provision of the agreement and is, therefore, protected by the Act. Article 28, section 5, of the agreement forbids all work stoppages "except as specifically permitted under the provisions of Article 8." Article 8, section 7, clearly creates an exception for cases where a party has failed to comply with an arbitrator's award. However, there is nothing in the language of Article 8, section 9, that specifically permits an unauthorizes walkout of less than 24 hours' duration. Furthermore, no intent to do so can be inferred from a prohibition of discharge during such a walkout. The purpose of that prohibition would seem to be to give the employees who participate in an unauthorized work stoppage a day to reconsider their action before being subject to the extreme penalty of discharge. However, there is no question that under the terms of Article 8, section 9, the Company retains the power to impose reasonable discipline short of discharge upon employees who participate in an unauthorized work stoppage lasting less than 24 hours. That provision is consistent with the other terms of the agreement only on the assumption that such a strike is still illegal under

---

for this rule. First, the failure to raise such a defense may indicate that neither party to the contract desires arbitration—a factor clearly mitigating against deferral. Second, the rule assures that the Board will have the opportunity of deciding whether to defer to arbitration after hearing all the facts relevant to the appropriateness of deferral in each particular situation. In this case, however, the Company did not raise the deferral issue before either the Administrative Law Judge or the Board, but rather defended on the merits, urging the acceptance of its interpretation of the 24-hour clause. We therefore do not feel that this

is a case in which the Board was required to defer to arbitration.

10. The language of the Board's finding makes its reasoning somewhat unclear since it simply runs together the issues of whether the 24-hour clause of Article 8, section 9, prohibits discharge and of whether it creates an exception to the no-strike provision: "Reasonably interpreted, viewed in light of the evident purpose of the provision, it is found that the proviso excludes from the prohibition against work stoppages those of less than 24 hours as a cause for immediate discharge." (P. 16 of Administrative Law Judge's decision.)

the agreement.[11] While it is true that the source of that illegality may be the unauthorized nature of the strike, rather than the work stoppage itself, the policy behind the language of Article 8, section 9, can hardly be said to permit strikes of less than 24 hours' duration. Thus, the strike in this case was in violation of the no-strike clause of the collective bargaining agreement and, hence, was not protected by the Act.

For the foregoing reasons, we hold that in discharging the casual drivers who participated in the walkout of November 17–18, 1971, the Company did not commit an unfair labor practice as defined in section 8(a)(1) of the Act. The Company's petition to review and set aside the March 12, 1973, order of the Board will, therefore, be granted and the Board's cross-application for enforcement of that order will be denied.

11. Indeed, the Board specifically found that the unauthorized work stoppage of the casual drivers was "in violation of the no-strike clause" (p. 9 of Administrative Law Judge's decision). This finding flatly contradicts the Board's holding that the strike was protected activity (see p. 12 and note 10, *supra*). That contradiction serves to highlight the confusion in the Board's analysis because of its failure to separate the question of the Company's right to discharge striking employees during the first 24 hours of an unauthorized work stoppage from that of whether strikes of less than 24 hours' duration are excepted from the no-strike provision of the agreement.