

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-30-1994

# Yellow Freight Syst. Inc. v. NLRB

Precedential or Non-Precedential:

Docket 94-3014

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Yellow Freight Syst. Inc. v. NLRB" (1994). *1994 Decisions*. Paper 144.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/144

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


Nos. 94-3014 and 94-3072


YELLOW FREIGHT SYSTEM, INC.,
                              Petitioner No. 94-3014,

                    v.

NATIONAL LABOR RELATIONS BOARD,
                              Respondent.

NATIONAL LABOR RELATIONS BOARD,
                              Petitioner No. 94-3072,

                    v.

YELLOW FREIGHT SYSTEM, INC.,
                              Respondent.



Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board


Argued July 20, 1994
Before: Scirica, Lewis, and Seitz, Circuit Judges.
Filed:  September 30, 1994
_____

Mark J. Mahoney
Larry G. Hall (Argued)
MATKOV, SALZMAN, MADOFF & GUNN
55 East Monroe Street
Suite 2900
Chicago, Illinois  60603
   Attorneys for Yellow Freight System, Inc.

Aileen A. Armstrong
    Deputy Associate General Counsel
Frederick C. Havard
    Supervising Attorney
Fred L. Cornell, Jr. (Argued)
NATIONAL LABOR RELATIONS BOARD
1099 14th Street, N.W.

Washington, D.C.  20570
    Attorneys for National Labor Relations Board

**OPINION OF THE COURT**

SEITZ, <u>Circuit Judge</u>.


**I.**


Before this court is a petition for review by Yellow Freight System, Inc. ("Yellow Freight") asking us to set aside an order of the National Labor Relations Board finding violations of the National Labor Relations Act ("Act").  The Board has cross-appealed for enforcement of its order.  Our jurisdiction is conferred by 29 U.S.C. § 160(f).  See <u>Yellow Freight Systems, Inc. v. NLRB</u>, 313 NLRB No. 15, (Nov. 24, 1993).

**II.  Yellow Freight's Petition for Review**

Yellow Freight's petition for review requires us to decide whether the Board's determination that John Mendez would have been hired as a regular employee of Yellow Freight but for his protected activity is supported by substantial evidence.

Yellow Freight is a unionized trucking company operating over six hundred terminals nationwide, including one in South San Francisco, California--the site of the alleged violations here. The Brotherhood of Teamsters & Auto Truck Drivers, Local 85 ("Union") represents the truckdrivers and dock workers at the South San Francisco site.

Employees at Yellow Freight are classified as either "casual" or "regular" employees.  Regular employees are designated on a seniority list that grants them employment

opportunities before other employees.  Casual employees are offered available work after the regular employees have received their assignments.  By working seventy (70) eight-hour shifts within six months, a casual employee can obtain "preferential" casual status.  This preferential status gives such employee priority over other casuals in regard to work assignments.  Under the local union agreement and National Master Freight Agreement, one casual employee is to be placed on the seniority list for each sixty-five vacation replacement days worked by a casual employee during each vacation quarter.

A casual employee is hired as a regular employee at Yellow Freight in a two-step process.  The first step consists of the on-site terminal manager's selecting a casual employee for that position.  The employee fills out a series of forms.  S/he takes a driver's written examination and a road test.  A background check is completed, and a physical examination is administered that includes an alcohol and drug test.  At the second step, these forms and the results of the examinations are sent to Yellow Freight's Human Resources Division in Tracy, California.  This office decides whether the casual employee will be hired as a regular employee.

John Mendez, the individual grievant, is a member of the Union and is a "casual" employee of Yellow Freight.  He alleges that the conduct of Yellow Freight employees violated § 8(a)(1) and (3) of the Act when he was not hired as a regular employee because of his supervisor's alleged hostility toward the union and Mendez' association with it.  The ALJ and the NLRB

agreed. Yellow Freight counters that their finding is not supported by substantial evidence but even if there is a showing in the record that protected union conduct was a motivating factor in the employment decision by Yellow Freight, the same decision would have been made due to Mendez's poor driving record.

Before turning to these issues we consider our standard of review. This court is not to overturn Board findings unless "there is no substantial evidence in the record, considered as a whole, to support them." Tubari, Ltd. v. NLRB, 959 F.2d 451, 453 (3d Cir. 1992); see 29 U.S.C. § 160(e). According to the Supreme Court in Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951),

> "[s]ubstantial evidence is more than a mere scintilla.
> It means such relevant evidence as a reasonable mind
> might accept as adequate to support a conclusion."
> Consolidated Edison Co. v. Labor Bd., 305 U.S. 197, 229
> (1938). Accordingly, it "must do more than create a
> suspicion of the existence of the fact to be
> established. . . . it must be enough to justify, if the
> trial were to a jury, a refusal to direct a verdict
> when the conclusion sought to be drawn from it is one
> of fact for the jury." Labor Bd. v. Columbian
> Enameling & Stamping Co., 306 U.S. 292, 300 (1939).

Mendez's grievance arises out of the actions of his supervisors, Michael Bloss and Mark Graybill, at the South San Francisco terminal. He alleges that these supervisors made statements and acted in a manner that constituted discriminatory conduct toward him as a result of anti-union animus and that such actions and attitudes were motivating factors in his not being considered for a regular position. The ALJ and the Board so

found.  Yellow Freight argues before us that the finding is not supported by substantial evidence.  We turn to that issue.

Before the Board, Mendez charged that Yellow Freight violated § 8(a)(1)(3) of the Act.  Section 8(a)(1) of the Act proscribes as "unfair labor practices" acts of employers that "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title."  29 U.S.C. § 158(a)(1).  Section 8(a)(3) defines "unfair labor practice" as an act by an employer that is motivated by "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."  29 U.S.C. § 158(a)(3).

In determining whether an employer's decision to deny an employee advancement constitutes an unfair labor practice under §§ 8(a)(1)(3) of the Act, the General Counsel bears the burden of showing by a preponderance of the evidence that protected conduct was a motivating factor in the employer's decision.  Compare D & D Distrib. Co. v. NLRB, 801 F.2d 636, 641 (3d Cir. 1986).  General Counsel, on behalf of Mendez, presented witnesses who testified to certain conduct by Yellow Freight employees that the ALJ and Board held violative of the Act.  The testimony from these Yellow Freight witnesses involved, inter alia, several statements made by Bloss and Graybill about Mendez's use of the union grievance procedure to complain of working conditions and work assignments.

Bloss apparently became aware from a dispatcher that Mendez was making complaints to the union concerning his work shifts. Yellow Freight's Br., Exh. A at 10-11. Bloss was heard to state that Mendez had developed "an attitude problem." Id. Mendez communicated his complaints to Raymond Cozzette, a Yellow Freight employee who acted as the Union's Chief Shop Steward. Cozzette was characterized as a zealous union official who filed "a lot of grievance [sic] on behalf of the unit employees." Id. at 11 ¶1. Bloss testified that he considered Cozzette a "troublemaker" and that he had communicated that sentiment publicly. Id. at ¶2.

During Mendez's second interview for the position of regular employee, Bloss asked Mendez "what had [he] thought about the Union?" Id. at 12 ¶2. After the question was asked, Bloss then proceeded to give Mendez his views on the Union and the collective bargaining agreement and offered Mendez a suggestion that he should stop hanging around the "wrong people." Id. Bloss was also heard to tell a union shop steward that he did not intend to hire Mendez because of his alleged attitude problem and association with "troublemakers" and that he "was just go[ing] through the motions of interviewing Mendez." Id. at 16 ¶1.

Based on the foregoing record, we conclude that the finding of the ALJ and the Board that Yellow Freight's decision not to advance Mendez for protected conduct was supported by substantial evidence.

As an affirmative defense, Yellow Freight offered testimony from Mark Kirkpatrick, the Manager of the Human

Resources Department, that even if Mendez had been suggested for a regular employment position, he would have been rejected under the company's April 1990 policy[1] in regard to moving violations. See NLRB v. Transportation Management Corp., above.  Mendez and the Union countered that one or both of the terminal supervisors, Bloss and/or Graybill, knew of Mendez's driving record.  Despite their knowledge of the violations on his record, on several occasions they assured Mendez and union representatives Cozzette and Charles McLin that Mendez was still being considered for a regular position.  Id. at 25-27.  Not only was the April 1990 policy not applied at the outset of the hiring process, but Mendez was given a background check, drug/alcohol test, physical

---

[1].  The April 24, 1990 policy issue by Yellow Freight's vice-president for human resources reads in pertinent part as follows:
> Effective immediately, three key requirements for road drivers  .   .   .   have been changed.    Use these requirements when you screen applicants for driver positions:
>
>  .  .  .  .
> Reject: an applicant with any one of these records:
>
>  .  .  .  .
> - A moving violation in the last 12 months.
> - More than one moving violation[] in the last 13-24 months.
>
>  .  .  .  .
>
> Applicants must meet these revised requirements, as well as the other current requirements you're familiar with -- license, driving ability, and physical condition.  If you have any questions about the driver requirements, please check with your Human Resource office .  .  .  .

Yellow Freight's Br., Exh. A at 23-24.
    This policy was sent from the human resources office to all of Yellow Freight's terminal managers and supervisors.

examination and a personal interview in preparation for his application to the position of regular employee. Id. at 1 (NLRB Decision & Order). Finally, it is apparent the company was not enforcing the policy because, despite Mendez's moving violations, he was employed as a casual driver and at no time had he been denied employment by Yellow Freight. Id. at 4 n.4.[2]

Based on his credibility determinations of the witnesses presented, the ALJ concluded that Yellow Freight had failed to meet its rebuttal burden. First, the ALJ rejected Bloss' testimony attempting to refute the allegations made by Mendez and the Union "in its entirety" stating that his "demeanor was poor" and the "lack of corroboration" of his testimony. Id. at 22 ¶4. While he rejected Bloss' testimony, the ALJ credited the testimony given by Cozzette, McLin and Cozzette's successor, Holland, in regard to the actions taken by Yellow Freight employees. Second, the ALJ rejected Kirkpatrick's testimony citing his "poor demeanor," id. at 27 ¶3, and "conclusionary testimony which was devoid [of] any kind of specificity," id. at ¶2. Kirkpatrick did not provide the ALJ with any documentary evidence that he or his office had vetoed any applicant based on the April 1990 policy. As a result of the lack of supporting evidence and corroboration, the ALJ refused to accept Kirkpatrick's conclusion that Mendez would have been rejected, in

---

[2]. Mendez was hired as a casual employee prior to the new policy's adoption and thus it was not considered when he was initially hired by Yellow Freight. The policy, however, does not distinguish between regular and casual drivers.

any event, under the April 1990 policy.  In addition to Kirkpatrick's testimony, the ALJ credited the testimony of Bloss and Graybill to the extent that it contradicted Kirkpatrick's testimony.

The Board agreed with the ALJ that Yellow Freight violated § 8(a)(1)(3) of the Act when it failed to hire Mendez as a regular employee solely because he engaged in activity that is protected by the Act.  It further held that Yellow Freight had not carried its affirmative defense that it would not have employed him as a regular employee in any event.

Because we conclude that there is substantial evidence to support the Board's ruling, we will deny Yellow Freight's petition for review and enforce the Board's order to the extent it granted relief to Mendez.[3]

## III.  The Board's Cross-Application for Enforcement of its Order

The Board's cross-application also asks us to enforce its order to the extent it found that Yellow Freight violated § 8(a)(1) of the Act because its South San Francisco terminal manager and a supervisor warned employees that they would be

---

[3]. The remedy ordered by the ALJ for this alleged violation included:  Mendez's placement on the seniority list or in a substantially similar position; removing any indication from his records regarding the unlawful refusal to hire him; and finally, making Mendez whole by providing him with any back pay or benefits and other damages to make up for any loss incurred as a result of the unlawful refusal to hire.  Yellow Freight Br., Exh. A at 47.

terminated if they walked off the job in violation of Yellow Freight's National Master Freight Agreement with the Union.[4]

The alleged violation involves the actions of supervisors Bloss and Mike Vega toward Union Agent Terry Hart. At the time of the incident, Hart was at the South San Francisco terminal discussing pending grievances with approximately fifteen drivers. Bloss asked Hart to leave the premises, citing his disruption of the workplace. Hart refused to leave and Bloss called the police. When the police arrived, they were taken to a room where Hart was meeting with the drivers. Hart attempted to rally the workers to strike. Bloss informed several employees that if they joined Hart in a strike they would be deemed to have quit their positions because they were on the clock and would thus be abandoning their jobs. Hart again attempted to generate a walkout. Both Bloss and Vega again told the drivers of the possibility of termination. Hart finally acquiesced and told the drivers to remain on the job.

The question raised by the Union's allegation is whether Yellow Freight's employees, Bloss and Vega, interfered with and restricted protected activity contrary to § 8(a)(1) of the Act. More explicitly, the issue is whether Hart's actions were

---

[4]. The Board adopted the Order of the ALJ in regard to this issue. The ALJ Order requires that Yellow Freight "[c]ease and desist from: . . . [t]hreatening employees with immediate discharge if they engage in an unauthorized work stoppage, where the collective-bargaining agreement between the Union and [Yellow Freight] grants the employees immunity from discharge for the first 24 hours of participation in such unauthorized activities." Yellow Freight Br., Exh. A at 48.

protected activity under the Union's collective bargaining agreement with Yellow Freight.[5]

The Board held that Hart's activity was protected and thus concluded that Bloss and Vega violated the Act when they interfered. The Board so concluded even though it recognized that our court had held that when a contract with a no-strike provision exists, a strike is not protected activity. Food Fair Stores, Inc. v. NLRB, 491 F.2d 388 (3d Cir. 1974). It refused to follow our decision.

In Food Fair an employer terminated "casual drivers" who engaged in a walkout in violation of their collective bargaining agreement. The discharged employees argued that the provision limiting the employer's options for discipline created an exception to the no-strike provision. The Food Fair court rejected that argument and held that the employer's decision to

_____

[5]. The relevant provision of the collective bargaining agreement authorizes the employer to take certain actions when there is an unauthorized work stoppage. The provision recites:

> [T]he Employer, during the first twenty-four (24)-hour period of such unauthorized work stoppage in violation of this Agreement, shall have the sole and complete right of reasonable discipline, including suspension from employment, up to and including thirty (30) days, but short of discharge, and such employees shall not be entitled to or have any recourse to the grievance procedure . . . . After the first twenty-four (24)-hour period of an unauthorized stoppage in violation of this Agreement, and if such stoppage continues, the Employer shall have the sole and complete right to immediately further discipline or discharge any employee participating in any unauthorized strike, slowdown, walkout, or any other cessation of work in violation of this Agreement, and such employees shall not be entitled to or have any recourse to the grievance procedure.

terminate the employees after only 18 hours on the picket line was not an unfair labor practice.

The reasoning of the Food Fair court was that these types of strikes violate the no-strike provisions in collective bargaining agreements and are therefore not protected activities under § 7 of the Act. Because these strikes are not protected activities, the court held that immediate discharge of such employees did not constitute an unfair labor practice. Id. at 395.

The Board in this case suggests adherence to the Board's decision in Wagoner Transportation Co., 177 N.L.R.B. 452, enforced per curiam, 424 F.2d 628 (6th Cir. 1970), holding that despite the no-strike clause, a wildcat strike that lasted less than 24 hours was a protected activity under § 7 of the Act. However, in Food Fair our court considered the Wagoner rationale and holding and specifically rejected them. Food Fair, 491 F.2d at 396.

The Board does not suggest that Food Fair is distinguishable in principle. Thus, it does not contend that our Internal Operating Procedure[6] is inapplicable. Consequently, we will adhere to it.

---

[6]. Internal Operating Procedure 9.1, entitled Policy of Avoiding Intra-Circuit Conflict of Precedent, recites the following:

It is the tradition of this court that the holding of a panel in a reported opinion is binding on subsequent panels. Thus, no subsequent panel overrules the holding in a published opinion of a previous panel. Court in banc consideration is required to do so.

## IV. Conclusion

Yellow Freight's petition for review of the Board's Order finding a violation of Mendez's rights will be denied and the Board's order to that extent will be enforced.  So much of the Board's cross-application for enforcement of the Board's order based on Yellow Freight's violation of § 8(a)(1) will be denied.

———————